RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0238P (6th Cir.)
File Name: 03a0238p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

ALI SHAMAEIZADEH,
    *Plaintiff-Appellant,*

*v.*

                    No. 01-6326

JOEL CUNIGAN et al.,
    *Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 97-00121—Karl S. Forester, Chief District Judge.

Argued: April 30, 2003

Decided and Filed: July 22, 2003

Before: MOORE and ROGERS, Circuit Judges; KATZ,
District Judge.[*]

———————

## COUNSEL

**ARGUED:** David R. Marshall, Lexington, Kentucky, for
Appellant. Bryan H. Beauman, STURGILL, TURNER,

———————

[*] The Honorable David A. Katz, United States District Judge for the
Northern District of Ohio, sitting by designation.

BARKER & MALONEY, Lexington, Kentucky, for
Appellees. **ON BRIEF:** David R. Marshall, Lexington,
Kentucky, for Appellant. Bryan H. Beauman, Douglas L.
McSwain, STURGILL, TURNER, BARKER & MALONEY,
Lexington, Kentucky, for Appellees.

———————

## OPINION

———————

    KAREN NELSON MOORE, Circuit Judge. Plaintiff-
Appellant Dr. Ali Shamaeizadeh ("Shamaeizadeh") appeals
the district court's grant of summary judgment for
Defendants-Appellees with respect to Shamaeizadeh's § 1983
claims and his state law malicious prosecution claim. On
March 14, 1994, the Richmond Police Department received
a call reporting the burglary of Shamaeizadeh's residence
("the residence"). An officer responded to the call and
searched the residence for the burglar. The officer then called
for assistance and conducted a second search with one of his
supervisors. After discovering evidence of drug paraphernalia
during the second search, the two officers called narcotics
experts to the scene to participate in a third search. Based on
the evidence discovered, the officers secured and executed
two search warrants for the residence. Shamaeizadeh was
indicted for federal drug violations, but the charges were
dismissed after the district court suppressed the evidence
seized from the basement of the residence.

    Shamaeizadeh filed a § 1983 action including federal
claims and a state law malicious prosecution claim against the
City of Richmond, Kentucky, the Richmond Police
Department, and five individual officers ("the officers") in
their individual and official capacities. Shamaeizadeh argues
that he is entitled to damages for the following reasons:
(1) the second and third warrantless searches were
unconstitutional; (2) there was no probable cause for either

search warrant; (3) the officers exceeded the scope of the first search warrant; (4) the officers included misrepresentations in the affidavit supporting the second warrant; (5) the officers arrested him without probable cause; (6) he was maliciously prosecuted; and (7) the City of Richmond failed properly to train and supervise its police officers. The district court granted summary judgment to the defendants on all grounds.

We **REVERSE** the district court's grant of summary judgment with respect to the second and third warrantless searches, and with respect to Shamaeizadeh's claim that the officers exceeded the scope of the first search warrant. We **AFFIRM** the district court on all other grounds.

## I. FACTS AND PROCEDURE

Shamaeizadeh owned a one-story house with a basement, located at 121 Millstone Drive, Richmond, Kentucky. He occupied the main floor of the residence with his fiancee, Theresa Schmitt ("Schmitt"), and rented the basement to Brian Reed ("Reed") and Joe Ford ("Ford"). All four residents of the house regarded the basement as a separate apartment.

On March 14, 1994, Schmitt placed an emergency call to the Richmond Police Department, reporting a possible burglary of the residence. Officer Mark Wiles ("Wiles") was dispatched and arrived five minutes later. Schmitt met Wiles at the front door, invited him into the residence, and walked into the kitchen. She told Wiles that she had left the back door open for her cats, and then had passed out on the kitchen table after taking muscle relaxants and consuming a beer. When Schmitt awoke, she noticed that her room key was missing from her pocket. She went into another room and, while she was there, someone allegedly reentered the house and broke the glass top of the kitchen table. Wiles observed broken glass on the kitchen floor.

Schmitt asked Wiles to search the residence with her, and he proceeded to walk through the main floor of the residence. Wiles discovered a locked door, but did not attempt to open it because Schmitt said that it was Shamaeizadeh's room and that Shamaeizadeh kept it locked when he was away. Wiles also discovered a broken door, which led to the basement. He did not examine the broken door because Schmitt said she had kicked it open to use the telephone a few days earlier. Wiles later said that during this search he detected the odor of growing marijuana.

After searching the main floor of the house, Wiles moved onto a deck overlooking the backyard and searched the rear of the premises. Meanwhile, Schmitt entered the basement through the broken door, walked out through the back door of the basement apartment, and met Wiles in the backyard. Explaining that the occupants of the basement apartment were away on spring break, she asked Wiles to check the basement. Wiles proceeded to search the basement.

During his search, Wiles noticed that the basement contained several rooms. Many of the doors were locked, and Wiles did not attempt to open them. He did smell what he thought was growing marijuana. After walking through the basement, Wiles called Assistant Chief of Police Wayne Grant ("Grant") because he believed he needed the assistance of a supervisor.

Wiles and Schmitt returned to the kitchen and waited for Grant to arrive.[1] Schmitt never asked Wiles to leave. While they were waiting, Schmitt told Wiles that she believed the "government" was the burglar. Wiles was thus inclined to discredit Schmitt's allegations of burglary. When Grant

---

[1] Shamaeizadeh conceded at oral argument that, at some point prior to the second search, Schmitt informed Wiles that she believed that some of the other occupants of the house were growing marijuana.

arrived, Wiles briefed him about his activity thus far. Schmitt participated in the conversation, informing the officers that she would retrieve a key for the locked doors in the basement.

Wiles and Grant then conducted a second search of the basement apartment. They did not ask Schmitt's permission to conduct the search. When they entered the basement, Wiles again smelled what he suspected was marijuana. The officers discovered small marijuana cigarette butts, known as "roaches," in an ashtray. They also found boxes of fluorescent light bulbs under the apartment stairway and observed fluorescent lighting in one of the locked rooms turn on and off intermittently. They suspected that the fluorescent lighting was being used to grow marijuana because it is often used for that purpose. Schmitt arrived with a ring of keys, but none of them fit the locked doors.

Wiles and Grant then called Assistant Chief of Narcotics Bill Jesse ("Jesse"). They related their observations to him and requested the assistance of an officer experienced in detecting narcotics. Jesse dispatched Sergeant Joel Cunigan ("Cunigan") to the scene. Cunigan arrived at 9:20 p.m., approximately the same time that Wiles's immediate supervisor, Sergeant Sam Manley ("Manley"), arrived. Wiles and Grant briefed Cunigan and Manley on the situation. Then all four officers conducted a third search of the basement apartment. They did not explicitly ask Schmitt's permission to conduct the third search, but Schmitt participated in the walk-through of the basement.

When the officers entered the basement during the third search, Cunigan smelled a strong odor that he believed to be growing marijuana. The officers discovered a hemostat; rolling papers; a plastic bag of what was suspected to be marijuana, but was actually catnip; and a bag containing a variety of pills. At this point, they advised Schmitt of her rights. Schmitt stated her belief that Reed and Ford were growing marijuana in their basement apartment. According

to Schmitt, although she never saw marijuana, the scent was so strong that she covered her vents to avoid it, particularly at nighttime.

Cunigan called a state prosecutor and submitted a sworn affidavit in support of his application for a search warrant. A state court judge issued a warrant for the search and seizure of "[a]ny and all illegally possessed controlled substances including marijuana, both growing and processed, and any drug paraphernalia, also any and all illegally possessed prescription drugs." Joint Appendix ("J.A.") at 584 (1st Warrant).

At 11:19 p.m., Cunigan returned to the residence with other officers and an agent from the Drug Enforcement Agency to execute the search warrant, conducting a fourth search of the residence. The officers forcibly opened locked doors in the basement apartment, finding and seizing 393 marijuana plants and various pieces of growing equipment. In addition to the drugs and drug paraphernalia, the officers indicated that they seized "assorted paper records, receipts, bank records, insurance records, tax papers, personal ledgers, jewelry." J.A. at 585 (1st Warrant) (notes on warrant).

On March 15, 1994, Detective John Telek ("Telek") signed an affidavit in support of a second warrant to search the house and two vehicles found there. According to the warrant, Telek was permitted to search for the following items:

1. Any and all illegally possessed controlled substances to wit: Marijuana and any drug paraphernalia;
2. Any and all tax records or documents reflecting the income and/or sources of income of any of the above named persons[;]
3. Any documents reflecting the purchase of drug paraphernalia including the receipts for grow lights, potting soil, fertilizer, plant pots, fans[.]

J.A. at 589 (2d Warrant). Shamaeizadeh claims that this search warrant was drafted in an attempt to cover up the illegal seizure of items during the execution of the first warrant.

Upon the recommendation of the local Commonwealth Attorney and a representative of the United States Attorney for the Eastern District of Kentucky, the Richmond Police Department turned over the evidence and prosecution of this matter to the United States government. Shamaeizadeh, Reed, and Ford were arrested and indicted for federal drug-law violations under 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S.C. §§ 2 and 924(c)(1). Shamaeizadeh was also charged with renting the basement apartment for the purpose of unlawfully manufacturing, storing, or distributing marijuana under 21 U.S.C. § 856. None of the officers who searched Shamaeizadeh's residence testified before the grand jury.

Shamaeizadeh, Reed, and Ford moved to suppress the evidence seized pursuant to the first warrant. At the suppression hearing, Cunigan and Wiles, the only officers directly involved in Shamaeizadeh's criminal prosecution, testified. The magistrate judge concluded that Wiles's initial warrantless search of the residence was constitutional due to exigent circumstances, but found the second and third warrantless searches unconstitutional. The magistrate judge recommended that Cunigan's affidavit be redacted to reflect only the information obtained as a result of the initial search and through conversations with Schmitt. He then concluded that the redacted affidavit provided probable cause to search the main floor of the residence for illegal drug activity, but not probable cause to support a warrant for the basement. The magistrate judge therefore recommended suppressing the evidence seized from the basement, and the district court adopted this recommendation. The government appealed the district court's decision to suppress the evidence, and the Sixth Circuit affirmed. *United States v. Shamaeizadeh*, 80 F.3d 1131 (6th Cir. 1996). The government then moved to

dismiss the indictment, and the district court granted the motion.

Shamaeizadeh brought a § 1983 action against the City of Richmond, the Richmond Police Department, and five individual police officers — Cunigan, Wiles, Manley, Telek, and Grant — for damages caused by the illegal searches and Shamaeizadeh's subsequent prosecution. Shamaeizadeh also claimed that he was maliciously prosecuted in violation of state law. The officers filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

The district court ruled that Shamaeizadeh's claims relating to the alleged illegal search, seizure, and Shamaeizadeh's subsequent arrest were time barred. The district court also dismissed Shamaeizadeh's malicious prosecution claim, finding that the officers were entitled to qualified immunity. Finally, the district court declined to exercise pendent jurisdiction over the state law claims, dismissing them.

Shamaeizadeh appealed the district court's dismissal of his action. The Sixth Circuit reversed, and the Supreme Court denied certiorari. *Shamaeizadeh v. Cunigan*, 182 F.3d 391 (6th Cir.), *cert. denied*, 528 U.S. 1021 (1999). When the case returned to the district court for discovery, the district court agreed to exercise pendent jurisdiction over the state law claims.

The officers filed a motion for judgment on the pleadings or for summary judgment. The district court considered Shamaeizadeh's "(1) 42 U.S.C. § 1983 claim based upon an illegal search, seizure and wrongful arrest; (2) 42 U.S.C. § 1983 claim for 'misrepresentation' and (3) . . . state law malicious prosecution claim." J.A. at 396 (Op. & Order). The district court entered summary judgment for the defendants and dismissed Shamaeizadeh's claims with prejudice.

Shamaeizadeh timely appealed from the district court's order entering final judgment in favor of the defendants.

## II. ANALYSIS

We review a district court's order granting summary judgment de novo. *Rannals v. Diamond Jo Casino*, 265 F.3d 442, 447 (6th Cir. 2001), *cert. denied*, 534 U.S. 1132 (2002). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). A dispute over a material fact is not considered "genuine" unless a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quotation omitted). In deciding whether summary judgment was appropriate, we view all evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### A. Shamaeizadeh's Standing to Challenge the Basement Searches

The district court granted summary judgment to the officers on Shamaeizadeh's § 1983 claims that the basement was illegally searched, reasoning that Shamaeizadeh did not have a reasonable expectation of privacy in the basement apartment.[2] Shamaeizadeh contends that he has standing to challenge the basement searches because he owned the

---

[2]In Shamaeizadeh's federal criminal case, the district court had concluded that Shamaeizadeh did not have any expectation of privacy in the basement apartment and therefore lacked standing to bring a motion to suppress evidence seized therein. Shamaeizadeh sought to appeal this determination, but the Sixth Circuit dismissed the appeal for lack of jurisdiction. *United States v. Shameizadeh* [sic], 41 F.3d 266, 267 (6th Cir. 1994).

basement and lived in close proximity to it. He does not maintain, however, that the basement was part of his residence.

To assert a Fourth Amendment violation, Shamaeizadeh must show that the government's action in some way invaded his own reasonable expectation of privacy. *United States v. Knotts*, 460 U.S. 276, 281 (1983); *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). We apply a two-part test to determine whether Shamaeizadeh had a reasonable expectation of privacy, asking (1) whether Shamaeizadeh "manifest[ed] a subjective expectation of privacy in the premises searched"; and (2) whether society is "prepared to recognize that expectation as legitimate." *Bonds v. Cox*, 20 F.3d 697, 701 (6th Cir. 1994).

Assuming that Shamaeizadeh manifested a subjective expectation of privacy because he owned the basement and lived in close proximity to it, society is not prepared to recognize that expectation as legitimate. Although Shamaeizadeh owned the entire residence, ownership alone does not justify a reasonable expectation of privacy. The Supreme Court has consistently held that privacy interests are not coterminous with one's property rights. *United States v. Salvucci*, 448 U.S. 83, 91 (1980) ("[W]hile property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, property rights are neither the beginning nor the end of this Court's inquiry." (citation omitted)). In deciding whether someone has a reasonable expectation of privacy for Fourth Amendment purposes, courts consider a number of factors, including

the person's proprietary or possessory interest in the place to be searched or item to be seized . . . . whether the defendant has the right to exclude others from the place in question; whether he had taken normal precautions to maintain his privacy; whether he has exhibited a

subjective expectation that the area would remain free from governmental intrusion; and whether he was legitimately on the premises.

*United States v. King*, 227 F.3d 732, 744 (6th Cir. 2000); *see Hardwig v. United States*, 23 F.2d 922, 922 (6th Cir. 1928) (concluding that a lessee who sublets part of a building to a sublessee personally has "no right to object to evidence of what was found or done there").

Although Shamaeizadeh had a proprietary interest in the basement of the residence, he has consistently stated that the basement apartment was maintained as a separate residence, indicating that he was not in possession of the basement. When the officers searched the residence, it was evident that the door between the main level and the basement had been forced open. Moreover, Wiles's testimony at the suppression hearing indicates that even he recognized that the basement "was an apartment" and that, in light of Schmitt's explanations, "he understood the residence at 121 Millstone to consist of a house with an apartment underneath it." J.A. at 37 (Magistrate Judge's Proposed Findings of Fact and Recommendation) (quotations and brackets omitted).[3] Therefore, Reed and Ford had the right to exclude others from the basement, but Shamaeizadeh did not. Shamaeizadeh took

---

[3]The Magistrate Judge's Proposed Findings of Fact and Recommendation were made in the context of a suppression hearing during the federal prosecution of Shamaeizadeh, Reed, and Ford. Although two state officers testified at the suppression hearing, they were not parties to the federal criminal action. Moreover, although Shamaeizadeh was a defendant in the criminal action, the district judge determined that he lacked standing to seek the suppression of evidence. Because neither the state officials nor Shamaeizadeh were parties to the suppression hearing, it would ordinarily be inappropriate for this court to consider the magistrate judge's factual findings in this civil action. However, because both parties rely on the magistrate judge's findings in their briefs before this court and neither party contests these findings, we may properly consider them.

no precautions to maintain any privacy interest he might have had in the basement when he leased the basement to Reed and Ford and permitted them to occupy it as a separate residence. Moreover, Shamaeizadeh did not exhibit "a subjective expectation that the area would remain free from governmental intrusion." *King*, 227 F.3d at 744. Therefore, in light of these factors, Shamaeizadeh had no expectation of privacy in the basement of the residence; any expectation of privacy in the basement belonged solely to the lessees, Ford and Reed.

Because Shamaeizadeh had no reasonable expectation of privacy in the basement apartment and has no standing to claim a constitutional violation on behalf of either lessee, the district court did not err by granting summary judgment to the defendants insofar as Shamaeizadeh's claims seek damages for the basement searches. Therefore, we will consider Shamaeizadeh's other claims only in the context of the searches of the main floor of the residence.

## B. Qualified Immunity

According to the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). We undertake a three-step analysis of qualified immunity claims:

First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient

evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (quotation omitted); *see also Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc).

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992). In other words, the unlawfulness must be apparent under preexisting law. The unlawfulness of an action may be apparent in light of "direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Feathers*, 319 F.3d at 848. "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see Russo*, 953 F.2d at 1042 ("[I]t need not be the case that the very action in question has previously been held unlawful." (quotation omitted)).

### 1. The Second and Third Warrantless Searches

Shamaeizadeh argues that the district court erred by dismissing his § 1983 claim that the second and third searches of the main floor of the residence were unconstitutional on the ground that these searches "were of no consequence and at best constitute harmless error." J.A. at 405 (Op. & Order). The district court did not determine the constitutionality of the searches, instead reasoning that Shamaeizadeh failed to allege an injury for § 1983 purposes because the information gathered during the second and third searches was purged from the affidavit supporting the subsequent search warrants. But Shamaeizadeh did allege an injury with respect to the second and third searches: a § 1983 plaintiff can seek

damages for pain, suffering, embarrassment, and humiliation. *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986) (explaining that a § 1983 plaintiff can seek compensatory damages for "impairment of reputation . . ., personal humiliation, and mental anguish and suffering" (quotation omitted)). Therefore, we must consider whether the officers are entitled to summary judgment on this part of Shamaeizadeh's § 1983 action on alternative grounds. Because the second and third searches were unconstitutional and the officers were not entitled to qualified immunity with respect to this conduct, we reverse the district court's grant of summary judgment on this issue.

The officers contend that the second and third searches were constitutional because either (1) Schmitt gave continuing consent for the searches, (2) exigent circumstances were present, or (3) the plain view doctrine applied. If any of these exceptions to the Fourth Amendment warrant requirement apply, the searches were constitutional.[4]

---

[4] The district court below and the district court during the criminal proceedings concluded that the second and third searches were unconstitutional. However, Shamaeizadeh cannot collaterally estop the officers from relitigating this issue because the officers — "the party against whom estoppel is sought" — did not have "a full and fair opportunity to litigate the issue" during the suppression hearing. *Detroit Police Officers Ass'n v. Young*, 824 F.2d 512, 515 (6th Cir. 1987). Although two defendants in the current action — Wiles and Cunigan — testified at the suppression hearing, neither they nor the other defendants in the present action had an opportunity fully and fairly to litigate the issue. Furthermore, the officers, the Richmond Police Department, and the City of Richmond are not in privity with the federal government, which was a party to the first action. *See United States v. White*, Nos. 91-2005, 91-2090, 91-2168, 91-2169, 91-2308, 91-2403, 1994 WL 70855, at **10 (6th Cir. March 3, 1994) ("[I]t would be a stretch to say that federal prosecutors are in privity with an exclusively state prosecution."), *cert. denied*, 513 U.S. 861, 513 U.S. 949 (1994); *cf. Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 402 (1940) ("There is privity between officers of the same government."). The fact that the federal government relied on evidence from state officers in a federal proceeding does not

### a. Consent

Consent from an individual whose property is to be searched or from a third party who possesses common authority over the premises validates a search that would otherwise be considered unreasonable and unconstitutional. *United States v. Matlock*, 415 U.S. 164, 171 (1974). However, even when a search is authorized by consent, "the scope of the search is limited by the terms of its authorization." *Walter v. United States*, 447 U.S. 649, 656 (1980). The Supreme Court has explained that "the scope of a suspect's consent under the Fourth Amendment" turns on what "the typical reasonable person [would] have understood by the exchange between the officer and the suspect[.]" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). As long as an officer has an objectively reasonable belief that the search was within the course of consent, the search is valid. *Id.* But the Fourth Amendment "requires that the scope of every authorized search be particularly described." *Walter*, 447 U.S. at 657.

The officers suggest that we should conclude that Schmitt provided continuing consent which authorized all three warrantless searches.[5] The police contend that, as a historical

matter, once consent is granted in Kentucky, it must be expressly revoked. Appellees' Br. at 23 (citing as support *Smith v. Commonwealth*, 246 S.W. 449, 451 (Ky. 1923), which held that consent cannot be revoked once a search has begun). Some states have recognized a principle of continuing consent, which allows officers to execute subsequent, closely-related searches in the absence of an objection because the absence of objection permits an inference that the initial consent continued. *See, e.g., State v. Luther*, 663 P.2d 1261, 1263 (Or. Ct. App. 1983), *aff'd*, 672 P.2d 691 (Or. 1983); *Phillips v. State*, 625 P.2d 816, 818 (Alaska 1980). But even if we were to recognize a principle of continuing consent that might extend throughout three separate searches closely related in time and purpose, the second and third searches exceeded the scope of Schmitt's initial consent.

The officers could not have had an objectively reasonable belief that the second and third searches were within the course of Schmitt's consent. Schmitt clearly consented to

---

bind the officers to the outcome of that proceeding. *See United States v. Perchitti*, 955 F.2d 674, 677 (11th Cir. 1992) (explaining that cooperation between federal and state authorities in the investigation of a defendant does not necessarily establish privity between the federal and state governments); *see also Ferina v. United States*, 340 F.2d 837, 840 (8th Cir.) (merely using the fruits of federal investigations in state proceedings "does not infect the separate sovereignty of that prosecution, nor bind the federal government in any manner to the issues so resolved by the state judgment"), *cert. denied*, 381 U.S. 902 (1965).

[5]Although they did not press the issue in their brief, the officers also suggested at oral argument that all three warrantless searches were actually components of a single constitutional search. This court has recognized "that a single search warrant may authorize more than one

entry into the premises identified in [a] warrant, as long as the second entry is a reasonable continuation of the original search." *United States v. Keszthelyi*, 308 F.3d 557, 568 (6th Cir. 2002). Although we have not previously applied *Keszthelyi* in the context of a search justified on grounds other than a warrant, it is clear that regardless of the source of authority for a search, a search ends when subsequent entries into the identified premises are not reasonable continuations of the original search. Thus, if the first search was constitutional because Schmitt consented to it, the search ended when it exceeded the scope of her consent to the officer's search for a possible intruder. Similarly, if the first search was constitutional because there were exigent circumstances, *see infra*, that search ended when the officers began to search for drugs rather than a burglar. *See Mincey v. Arizona*, 437 U.S. 385, 393 (1978) (explaining that a search justified by exigent circumstances is strictly circumscribed by the emergency that justifies it). The fact that Wiles called in additional officers with drug experience suggests that the searches for drugs and drug paraphernalia were new searches, rather than reasonable continuations of the constitutional search for a burglar.

Wiles's first search of the premises when she asked him to search for an intruder. But the officers do not assert that Schmitt explicitly consented to the second or third search. In fact, they admit that they did not expressly request her consent when additional officers arrived to search the residence and that they do not recall Schmitt expressly articulating any such consent of her own volition. Schmitt's request that Wiles search the residence for a burglar does not objectively indicate consent for Wiles to call in a supervisor and execute a second search or for Wiles and a supervisor to call in officers with more experience in detecting drugs to execute a third search. Because the second and third searches exceeded the scope of Schmitt's consent, they were unconstitutional.

### b. Exigent Circumstances

The officers also maintain that the second and third searches were constitutional because they were executed under exigent circumstances. Warrantless entries are permitted under exigent circumstances, which "exist where there are real immediate and serious consequences that would certainly occur were a police officer to postpone action to get a warrant." *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002) (quotations and brackets omitted). As with the consent exception to the warrant requirement, we measure exigent circumstances by a standard of objective reasonableness, asking "whether the facts are such that an objectively reasonable officer confronted with the same circumstances could reasonably believe that exigent circumstances existed." *Id.* Exigent circumstances typically exist in one of three situations: officers are in hot pursuit of a suspect, a suspect represents an immediate threat to officers and the public, or "immediate police action [is] necessary to prevent the destruction of vital evidence or thwart the escape of known criminals." *Hancock v. Dodson*, 958 F.2d 1367, 1375 (6th Cir. 1992).

No one contests that Wiles's initial search of the residence was conducted in the face of exigent circumstances. Wiles was dispatched to investigate a possible burglary and believed the burglar might still be present in the residence. The officers now claim that the second and third searches were necessary because the burglar may have been hiding behind locked doors. However, at the suppression hearing in the federal criminal trial, Wiles testified "that he called for backup not because he suspected that a burglary had occurred or because he suspected that a burglar may still be present in the residence, but because when he walked into the downstairs portion of the residence he smelled what he suspected to be growing marijuana." J.A. at 50 (Magistrate Judge's Proposed Findings of Fact and Recommendation). Moreover, Wiles's present claim that he sought backup for the purpose of looking for a possible intruder is inconsistent with the officers' decision to search the entire residence again, rather than simply to investigate the locked rooms that Wiles had been unable to enter. Most importantly, the fact that the officers called in narcotics experts to conduct the third search drastically undercuts the officers' claim that the possible presence of an intruder created exigent circumstances justifying a third search. These facts are such that an objectively reasonable officer could not have reasonably believed that there were exigent circumstances.

The officers' suspicion that marijuana was being grown in the residence also failed to create new exigent circumstances justifying a search. During the second and third searches, the officers were not in hot pursuit of a suspect, threatened by a suspect, or attempting to thwart the escape of a known criminal. The only arguable exigent circumstance in this context was a possible need to prevent the destruction of vital evidence. But the officers cannot argue that they were attempting to prevent the destruction of vital evidence because they were not even certain of what evidence they were searching for at the time — the second and third searches were fishing expeditions for evidence of a drug

crime. Thus, new exigencies did not arise to justify the second and third searches.

Because the exigencies justifying the first search did not continue and because new exigencies did not arise to justify the second and third searches, we cannot conclude that exigent circumstances justified the otherwise unconstitutional searches.

### c. Plain View

Finally, the officers maintain that their warrantless second and third searches of the residence were justified by the plain view doctrine because drug paraphernalia was in plain view during the second and third searches. To invoke the plain view doctrine, evidence must be "(1) in plain view; (2) of a character that is immediately incriminating; (3) viewed by an officer lawfully located in a place from where the object can be seen; and (4) seized by an officer who has a lawful right of access to the object itself." *United States v. Roark*, 36 F.3d 14, 18 (6th Cir. 1994). Although the plain view doctrine would likely have justified Wiles's seizure of immediately incriminating drug paraphernalia during the first search, it clearly cannot justify the second and third searches. For the exception to apply, an officer seizing an item in plain view must be "lawfully located." Because the officers were not lawfully in the residence during the second and third searches, the plain view doctrine cannot serve to constitutionalize an otherwise improper search. We therefore conclude that the officers would violate Shamaeizadeh's constitutional rights by seizing items in plain view while the officers were unlawfully present in Shamaeizadeh's residence.

Because none of the three asserted exceptions apply, we conclude that the officers are not entitled to summary judgment on grounds that the second and third searches were constitutional. In fact, there is no genuine issue of material fact about the constitutionality of the second and third

searches; even when viewed in the light most favorable to the officers, the facts indicate that these searches were unconstitutional.

Furthermore, the officers are not entitled to qualified immunity with respect to this aspect of Shamaeizadeh's § 1983 claim because their unconstitutional conduct "involved a clearly established constitutional right of which a reasonable person would have known." *Feathers*, 319 F.3d at 848. At the time of the searches, the Supreme Court had clearly stated that the justification for a search determines its appropriate scope:

> The manner in which the seizure and search were conducted is, of course, as vital a part of the inquiry as whether they were warranted at all . . . . [E]vidence may not be introduced if it was discovered by means of a seizure and search which were not reasonably related in scope to the justification for their initiation.

*Terry v. Ohio*, 392 U.S. 1, 28-29 (1968). A reasonable person would have known that the "scope of [a] search is limited by the terms of its authorization," *Walter*, 447 U.S. at 657. Moreover, it was clear that "[w]hile exigent circumstances may justify police conduct that would otherwise be unreasonable if undertaken without a warrant, such conduct must be strictly circumscribed by the exigencies which justify its initiation," *Segura v. United States*, 468 U.S. 796, 823 (1984) (quotation omitted). A reasonable officer therefore could not have objectively considered the consent or exigencies purportedly justifying the warrantless search to have extended beyond Wiles's initial search of the residence. Finally, because it was also clearly established that the plain view exception cannot serve to justify an otherwise unconstitutional search, we must conclude that the officers' second and third warrantless searches violated a clearly established constitutional right of which a reasonable person would have known. Shamaeizadeh "has offered sufficient

evidence to indicate that what the official[s] allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Feathers*, 319 F.3d at 848.

Therefore, we reverse the district court's grant of summary judgment on this issue, and we conclude that the officers are not entitled to summary judgment on Shamaeizadeh's § 1983 claims pertaining to the second and third searches either on the merits or on grounds of qualified immunity. In fact, we conclude that the second and third searches were unconstitutional.

**2. Probable Cause for the Warrants**

Shamaeizadeh argues that the district court erred in concluding that Cunigan's affidavit provided probable cause for the first warrant to search the main floor. The district court concluded that there was sufficient legally acquired information in Cunigan's redacted affidavit to establish probable cause. In doing so, the district court ignored the Sixth Circuit's observation in dicta during review of the earlier criminal proceedings that "[c]uriously, the magistrate never recommended redacting Cunigan's entire statement from the affidavit, even though it appears to be the fruit of an illegal search." *United States v. Shamaeizadeh*, 80 F.3d 1131, 1137 n.3 (6th Cir. 1996). Although the Sixth Circuit has previously discussed this issue, a discussion occurring in the context of a federal criminal case is not binding on the state officers who are parties to this civil action. Nevertheless, Shamaeizadeh urges us to adopt the view articulated by the Sixth Circuit in the prior criminal appeal and argues that all evidence in Cunigan's affidavit was poisonous fruit of the unconstitutional second and third searches, such that the entire affidavit should be rejected.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be

searched, and the persons or things to be seized." U.S. Const. amend. IV. An affidavit on which a search warrant is issued need not reflect direct personal observations of the affiant if the hearsay information is derived from a credible source. *United States v. Ventresca*, 380 U.S. 102, 108 (1965). When deciding whether to issue a search warrant, a magistrate simply must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Therefore, we must determine whether Cunigan's affidavit established a fair probability that evidence of a crime would be found at the residence.

Cunigan's affidavit set forth the following information about Shamaeizadeh's suspected drug activity:

> On the 14th[ ]day of March, 1994, at approximately 8:34, the Richmond Police Department received a call [from] Teresa Schmidt [sic] of 121 Millstone Drive, and Ms. Schmidt [sic] reported that there had been a burglary at her residence. Officer Mark Wiles responded to the alleged burglary and upon entering the residence and beginning the investigation Officer Wiles along with Sgt. Sam Manley and Asst. Chief Wayne Grant observed numerous items of drug paraphernalia, partially smoked marijuana cigarettes, plastic bag containing several different types of what appeared to be prescription pills and plastic bag containing what readily appeared to be suspected marijuana. At this time I was contacted and I went to the residence where I also observed the same items.
> While in the residence, I detected a strong odor of growing marijuana both upstairs and downstairs. Several of the rooms in the residence were locked and we were unable to look inside them.

According to Schmidt [sic], some of the other occupants of the house are growing marijuana inside the house.

From under the door of one of the locked rooms, I could see a strong florescent [sic] light glow.

J.A. at 587 (Cunigan Aff.). We cannot consider some of the information included in Cunigan's affidavit, however, because "[t]he exclusionary rule prohibits introduction into evidence . . . of testimony concerning knowledge acquired during an unlawful search." *Murray v. United States*, 487 U.S. 533, 536 (1988).

Although the second and third searches were unconstitutional, the searches of the basement violated only Reed's and Ford's constitutional rights. "[A] court may not exclude evidence under the Fourth Amendment unless it finds that an unlawful search or seizure violated the defendant's own constitutional rights," meaning that the challenged conduct invaded the defendant's expectation of privacy. *United States v. Payner*, 447 U.S. 727, 731 (1980) (citing *Rakas*, 439 U.S. at 138). In this context, the evidence seized from the basement during the second and third searches of the basement did not invade Shamaeizadeh's expectation of privacy. Therefore, in determining whether probable cause was present for issuance of the first search warrant, we need not redact Cunigan's affidavit to exclude all evidence that was seized during the second and third searches in violation of someone's constitutional rights. Rather, we exclude from the affidavit only evidence gathered from the main floor of the house in violation of *Shamaeizadeh's* constitutional rights.

Most of the statements in Cunigan's affidavit rely on evidence seized from the basement of the residence, and need not be redacted in Shamaeizadeh's case. Therefore, in evaluating the existence of probable cause for the issuance of the first search warrant, we can consider Cunigan's statements about drugs and drug paraphernalia in the basement and the

strong fluorescent-light glow under one of the locked doors in the basement. As the district court noted, Cunigan also was entitled to rely on "Schmitt's statement that some of the other occupants of the house were growing marijuana." J.A. at 403 (Op. & Order). Cunigan could also rely on Wiles's observations of the smell in the basement for the purpose of establishing probable cause, but we must redact from Cunigan's affidavit any suggestion that Cunigan detected a strong scent of marijuana on the main floor of the residence because the second and third searches of the main floor were unconstitutional. Upon considering this evidence, we conclude that the information remaining in the redacted affidavit did establish a "fair probability that contraband or evidence of a crime" would be found in the basement residence. *Gates*, 462 U.S. at 238.

Similarly, the evidence in Telek's affidavit that was filed in support of the second warrant established a "fair probability that contraband or evidence of a crime" would be found in the basement residence. *Gates*, 462 U.S. at 238. Telek's affidavit was identical to Cunigan's, with the exception of one additional paragraph that explained,

Based on the forgoing [sic] information a Search Warrant was secured for the premises and over 390 marijuana plants were recovered from the residence. According to the Chief of Police, also found during the search, was a receipt reflecting that Ali [Shamaeizadeh] purchased some lights and a blower. From my experience, these types of items would commonly be used in the type of growing operation as was discovered here on Millstone Drive.

J.A. at 591 (Telek Aff.). In addition to the evidence excluded from Cunigan's affidavit, Shamaeizadeh's receipt for the purchase of lights and a blower should be excluded from Telek's affidavit because it is unclear whether the officers seized this evidence from the basement or the main floor of

the residence. The 390 marijuana plants were seized from the basement, so Shamaeizadeh does not have standing to challenge their inclusion in the affidavit. As with the first warrant, we conclude that the evidence in Telek's redacted affidavit was sufficient to provide probable cause for a second warrant, at least with respect to the basement.

Although the evidence discovered in the basement established probable cause for the first and second warrants to search that portion of the residence, the evidence discovered in the separate basement apartment does not in itself establish probable cause to search the entire house. "[W]hen the structure under suspicion is divided into more than one occupancy unit, probable cause must exist for each unit to be searched." *United States v. Whitney*, 633 F.2d 902, 907 (9th Cir. 1980), *cert. denied*, 450 U.S. 1004 (1981). Neither redacted affidavit establishes probable cause that evidence of a crime would be found "in [the] particular place" in question — the main floor of the residence. Therefore, we conclude that the officers committed a constitutional violation by searching the entire residence without probable cause to do so and that this right was clearly established.

Even though the officers violated Shamaeizadeh's clearly established constitutional rights, they are nevertheless entitled to qualified immunity if Shamaeizadeh has failed to offer sufficient evidence that the officers' actions were objectively unreasonable in light of the clearly established constitutional rights. *See Feathers*, 319 F.3d at 848. We conclude that, in light of the information available to the officers at the time of the search, it was objectively reasonable for them to believe that there was not a distinct boundary between the two parts of the residence.

The officers clearly knew that two men lived in the basement apartment and that they were away on spring break. However, they also had reason to believe that all occupants of the residence moved freely between the basement apartment

and the main floor. At the suppression hearing in the criminal case, Wiles testified that he discovered that the door between the two units had been kicked open. J.A. at 36 (Magistrate Judge's Proposed Findings of Fact and Recommendation). At the same hearing, Wiles testified that Schmitt led him into the basement and explained to him that although two men lived downstairs, "They don't mind me being down here; I use the phone on occasion," suggesting that she was at liberty to move throughout the entire residence. J.A. at 37 (Magistrate Judge's Proposed Findings of Fact and Recommendation) (quotation omitted). Before Wiles even entered the basement, he observed Schmitt "exiting through the back door of the downstairs portion of the residence." J.A. at 37 (Magistrate Judge's Proposed Findings of Fact and Recommendation). According to Wiles,

> It appeared . . . that [Schmitt] had free run of the house, with the exception of the locked rooms. She had even stated that she used the phone down there often. She told me it was fine to go down there. Even as I was in the back yard searching in the brush for possible suspects, she came and got me from the downstairs door.

J.A. at 453 (Wiles Dep.). This evidence suggests that the officers reasonably could have believed that all four occupants of the residence had access to the residence in its entirety. Therefore, it was objectively reasonable for the officers to conclude that they had probable cause for a warrant to search the entire house.

Thus, the officers had probable cause for both warrants to search the basement, and, as discussed above, reasonably could have believed on the facts of this case that this established probable cause for searches of the entire residence in light of the information available to them at the time. We therefore conclude that the officers are entitled to qualified immunity with respect to Shamaeizadeh's § 1983 claim that the officers lacked probable cause for the first and second

warrants, and affirm the district court's grant of summary judgment with respect to these claims.

### 3.     Wrongful Seizure During Execution of the First Warrant

Shamaeizadeh argues that the district court erred by concluding that the officers did not unconstitutionally seize items outside the scope of the first warrant. During the criminal case, the district court adopted the magistrate judge's finding that the officers' execution of the March 14, 1994, warrant went far beyond its terms when the officers seized paper records and receipts. The warrant authorized the officers to search for "[a]ny and all illegally possessed controlled substances including marijuana, both growing and processed, and any drug paraphernalia, also any and all illegally possessed prescription drugs." J.A. at 584 (1st Warrant). In addition to seizing these items, the officers also seized numerous documents, records, and pieces of jewelry.

Seizing items beyond the scope of a warrant's authorization violates the Fourth Amendment rights of the subject of a search. *Andresen v. Maryland*, 427 U.S. 463, 480 (1976); *see Brindley v. Best*, 192 F.3d 525, 533 (6th Cir. 1999) (reversing a district court's grant of summary judgment because "[n]o reasonable officer in the defendants' position could have believed that certain seized items were within the scope of the warrant or evidence of a crime"). Generally, officers are obligated to secure an additional warrant if they want to seize things not included in a warrant. However, where a warrant justifies an officer's initial intrusion and the officer "in the course of the search come[s] across some other article of incriminating character," the plain view doctrine may supplement the prior justification and permit the warrantless seizure. *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971).

Under the plain view doctrine, officers may seize items not within the scope of the warrant where the evidence is "(1) in plain view; (2) of a character that is immediately incriminating; (3) viewed by an officer lawfully located in a place from where the object can be seen; and (4) seized by an officer who has a lawful right of access to the object itself." *Roark*, 36 F.3d at 18. Assuming that the officers were executing a valid warrant and thus were legally in a place where they saw the jewelry and documents in plain view, the seizure of these items during the execution of the first warrant was nevertheless unconstitutional because their incriminating character is not immediately apparent as an objective matter.

In determining whether probable cause is immediately apparent upon viewing an object, this court has considered three factors:

> (1) the nexus between the seized object and the items particularized in the warrant; (2) whether the intrinsic nature or appearance of the seized object gives probable cause to associate it with criminal activity; and (3) whether probable cause is the direct result of the executing officer's instantaneous sensory perceptions.

*United States v. Calloway*, 116 F.3d 1129, 1133 (6th Cir.), *cert. denied*, 522 U.S. 925 (1997). "[A]ssuming that there is probable cause to associate the property with criminal activity," however, a plain view seizure is "presumptively reasonable" and does not require an "unduly high degree of certainty." *Texas v. Brown*, 460 U.S. 730, 741-42 (1983) (quotation and emphasis omitted).

The officers argue that probable cause to seize the jewelry was immediately apparent because they reasonably believed that the jewelry was derived from the proceeds of drug-related crimes. Although an officer need not be sure an item in plain view is contraband in order to seize it, "when an item appears suspicious to an officer but further investigation is required to

establish probable cause as to its association with criminal activity, the item is not immediately incriminating." *United States v. McLevain*, 310 F.3d 434, 443 (6th Cir. 2002) (quotation omitted). Nothing about the intrinsic nature of the jewelry gave the officers cause to associate it with the drug activity under investigation. *Calloway*, 116 F.3d at 1133. Because further investigation would be necessary to establish probable cause of the existence of a relationship between the jewelry and illegal drugs or drug paraphernalia, we conclude that there was no clear nexus between the jewelry seized "and the items particularized in the search warrant." *United States v. Beal*, 810 F.2d 574, 576 (6th Cir. 1987).

The officers also maintain that probable cause to seize the documents was immediately apparent because the documents suggested that Shamaeizadeh had multiple identities and was forging instruments in violation of Kentucky law. With respect to the documents, reasonable officers could not believe that probable cause was apparent as a "direct result of the officer's instantaneous sensory perception of the object." *Id.* at 577 (quotation omitted). To have probable cause for associating the seized documents with possible criminal activity, the officers would have required far more than an instant to conclude that any of the documents implicated criminal activity. The plain view exception therefore does not apply to the seizure of either the jewelry or the documents.

The officers violated a clearly established constitutional right of which reasonable persons would have known — a right to be free of seizures beyond the scope of a warrant, in the absence of an exception to the warrant requirement such as the plain view doctrine. Moreover, the undisputed evidence indicates that the officers' seizure of documents and jewelry was objectively unreasonable in light of these clearly established rights. Therefore, we conclude that the officers are not entitled to qualified immunity with respect to Shamaeizadeh's claims of wrongful seizure, and that the

district court erred by granting summary judgment to the officers regarding these claims.

## C.  Misrepresentation & False Arrest

Shamaeizadeh explicitly states that his misrepresentation and false arrest claims hinge on this court finding that Shamaeizadeh has standing to challenge the searches of the basement. In fact, his entire argument with respect to these two claims is as follows:

> Misrepresentation and False Arrest
> The Court dismissed Appellant[']s constitutional claim for misrepresentation by Appellees on the affidavit for a warrant by failing to put that the house consisted of two residences. The Court felt that there was no causal connection between the warrant search and the misrepresentation. Secondly, the Court felt that Appellant had no claim for false arrest under §1983 because, again, there was no causal connection between the arrest and the improper search because Appellant had no standing to complain about the basement search.
> However, if Appellant has standing, as argued above, to the basement search then the Court was in error concerning the issues and must be reversed.

Shamaeizadeh Br. at 23-24. Because we conclude that Shamaeizadeh does not have standing to contest the basement searches, we need not address his claims of misrepresentation and false arrest.

## D.  Malicious Prosecution

Shamaeizadeh argues that the district court erred in granting the officers summary judgment on his state law malicious prosecution claim as well. Under Kentucky law, there are six elements of malicious prosecution:

(1) the institution or continuation of original judicial proceedings, either civil or criminal, or of administrative or disciplinary proceedings, (2) by, or at the instance, of the plaintiff, (3) the termination of such proceedings in defendant's favor, (4) malice in the institution of such proceeding, (5) want or lack of probable cause for the proceeding, and (6) the suffering of damage as a result of the proceeding.

*Collins v. Williams*, 10 S.W.3d 493, 496 (Ky. Ct. App. 1999) (quoting *Raine v. Drasin*, 621 S.W.2d 895, 899 (Ky. 1981))*; see McMaster v. Cabinet for Human Res.*, 824 F.2d 518, 520-21 (6th Cir. 1987).

Shamaeizadeh has failed to demonstrate the initiation or maintenance of a proceeding against the plaintiff by the defendants. *See* William L. Prosser & W. Page Keeton, *Prosser & Keeton on The Law of Torts* § 119, at 871 (5th ed. 1984). Neither the officers, the Richmond Police Department, nor the City of Richmond were involved in the prosecution of Shamaeizadeh. Although two officers testified at the suppression hearing during the criminal proceedings, Shamaeizadeh does not contest that he was indicted by a federal grand jury and none of the defendants so much as testified before the grand jury. Because the initiation or maintenance of a proceeding by the defendants is an element of malicious prosecution claims under Kentucky law, we affirm the district court's grant of summary judgment to the defendants with respect to Shamaeizadeh's state malicious prosecution claim.

### E. Municipal Liability

We construe Shamaeizadeh's § 1983 claims against the officers in their official capacity as claims against the City of Richmond. "[A] section 1983 action against a city official in his or her official capacity is treated as an action against the City entity itself." *Barber v. City of Salem*, 953 F.2d 232, 237

(6th Cir. 1992). Shamaeizadeh also states a claim against the City of Richmond for "fail[ing] or refus[ing] to supervise the training of the other Defendants or to cause them to be trained thus showing a deliberate indifference to the violation of the constitutional rights of the Plaintiff." J.A. at 28 (2d Am. Compl. ¶ 14).

To establish municipal liability pursuant to § 1983, a plaintiff must allege an unconstitutional action that "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or a "constitutional deprivation[] visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). Only then can "the action of the municipality itself . . . be said to have caused the harm." *Berry v. City of Detroit*, 25 F.3d 1342, 1345 (6th Cir. 1994), *cert. denied*, 513 U.S. 1111 (1995); *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) ("[A] municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983.").

The Supreme Court has limited § 1983 actions for the inadequacy of police training, reasoning that "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Harris*, 489 U.S. at 389. There is no evidence that Richmond's police-training policies demonstrate deliberate indifference to Shamaeizadeh's constitutional rights. The City of Richmond trains officers at Eastern Kentucky University's law enforcement program and the Department of Justice's basic training program, provides specific training on the execution of searches and seizures, and provides field officers with training manuals and a manual containing a

black-letter-law summary of search and seizure law. The defendant officers completed basic training and were periodically instructed on developments in criminal law. Shamaeizadeh has failed to set forth any facts showing that the City was deliberately indifferent to the training of its officers.

Furthermore, Shamaeizadeh also has failed to identify any specific custom, policy, or practice either with respect to the officers' training or with respect to the officers' searches of his residence and seizure of items therefrom. He does not allege any facts linking the conduct of individual officers to a policy of the City of Richmond or its police department. Therefore, we conclude that the district court did not err by granting the City of Richmond summary judgment with respect to this portion of Shamaeizadeh's claim.

### III. CONCLUSION

For the reasons explained above, we **REVERSE** the district court's grant of summary judgment with respect to the second and third warrantless searches, and with respect to Shamaeizadeh's claim that the officers exceeded the scope of the first search warrant. We **AFFIRM** the district court on all other grounds. We **REMAND** for further proceedings consistent with this opinion.