**Earl PORTER, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 09–CO–425.**

District of Columbia Court of Appeals.

Argued March 24, 2011.

Reargued Nov. 9, 2011.

Decided Feb. 16, 2012.

---

**35.** See footnote 21, *supra.*

Jonathan W. Anderson, Public Defender Service, with whom Jaclyn S. Frankfurt and James Klein, Public Defender Service, were on the brief, for appellant.

Michael J. Friedman (counsel for argument on March 24, 2011) and David B. Goodhand, (counsel for argument on November 9, 2011), Assistant United States Attorneys, with whom Ronald C. Machen Jr., United States Attorney, and Roy W. McLeese III, Elizabeth Trosman and Margaret J. Chriss, Assistant United States Attorneys, were on the briefs, for appellee.

Before THOMPSON and OBERLY, Associate Judges, and NEWMAN, Senior Judge.*

THOMPSON, Associate Judge:

Appellant Earl Porter appeals from the trial court's denial of his D.C.Code § 23–110 motion, in which he sought relief on the ground that he received ineffective assistance from his trial counsel. The motion argued that Porter's trial counsel was ineffective in failing to seek suppression of evidence recovered from the scene of an alleged robbery. The trial court assumed that appellant's trial counsel was remiss in that regard and that a motion to suppress would have been successful, but it denied the § 23–110 motion because the remaining evidence against appellant was "overwhelming." Because the factual record is not sufficiently developed to permit us to conclude that the omitted motion to suppress would have resulted in exclusion of a significant quantum of evidence, and because we also are unable to agree with the trial court that there is no reasonable probability that the outcome of Porter's trial would have been different had some or all of the evidence in question been excluded, we are constrained to vacate the trial court's ruling on the § 23–110 motion, and to remand for further proceedings.

**I.**

Appellant was tried on one count of robbery of a senior citizen, stemming from an event in October of 2003; and on charges of armed robbery, possession of a firearm during a crime of violence ("PFCV"), and possession of an unregistered firearm, all stemming from an incident in December

* Judge Kramer was assigned to this case at the time it was argued. Following her retirement on May 1, 2011, Judge Newman was assigned to take her place on the division.

2003. The jury acquitted appellant of the October robbery count, but found him guilty on all charges related to the December incident.

The October robbery charge was based on the testimony of John Anderson, who testified that he drove to the home of Marvella Bruce, with whom he had previously had intercourse, hoping to have intercourse with her. Anderson testified that when he arrived, he saw appellant, but accompanied Bruce into her bedroom after she assured him that appellant would not interfere. Anderson then testified that after he had been alone with Bruce for several minutes, appellant burst into the room with his hand under his shirt. Anderson testified that Bruce told him not to move and to empty his pockets. After giving appellant $345 and a watch, Anderson was allowed to take his keys and leave.

Vincent Walker recounted a similar story. He testified that in the early morning of December 4, 2003, after he had finished his evening work as a cigar salesman and had a few drinks, he encountered Bruce on the side of the road. He assumed she was a prostitute, let her into his car, and asked her to take him somewhere more secluded. She took him to the same house that Anderson testified he had visited in October. Once at the house, Walker and Bruce negotiated a price for a sex act. As Walker was undressing, appellant entered the room, pointed a sawed-off shotgun at Walker, and ordered him to sit on the couch. Walker testified that at some point, Bruce took his car keys, went to his car, came back and reported, "all he's got in there is cigar stuff." Walker testified that appellant took his bracelet, cufflinks, watch, earrings and other personal effects.

Appellant then returned Walker's keys and told him he was lucky to be leaving with his life. When Walker returned to his car, he noticed that the interior was in disarray, the trunk was open, and his backpack had been "rummaged through."

Walker testified that he then drove to a nearby 7–Eleven store and called the police. After police met Walker at the store (at about 4:07 a.m.), he accompanied them back to the scene, and four officers (Officers Tighe, Frost, Jackson, and Terrell) approached the house he had described. Officer Kevin Tighe testified that the officers knocked on the door, identified themselves, and then asked and were granted permission to briefly sweep the house "for our safety and your safety," explaining that they were investigating an armed robbery. Officer Tighe testified that Bruce told him that she and "two adult males" (appellant and Tyrone Hunt) were the only ones in the house. Officer Tighe further testified that the purpose of the sweep was "to make sure that there was nobody else in the house ... other than the three people that we were aware of," because "[w]e didn't want anybody jumping out with firearms."

Officers escorted Bruce, appellant, and Hunt, in turn, outside for "show up" identifications, and Walker positively identified Bruce and appellant as the robbers. At the time, appellant was wearing a bracelet that Walker later identified as his. Appellant and Bruce were arrested and secured in police cars. During Hunt's show-up appearance, Walker identified Hunt only as a man he (Walker) "had seen in front of the location when he was leaving out after the robbery." Thereafter, according to Officer Tighe's written report,[1] an officer escorted Hunt back inside the house while

1. The report was attached to the government's opposition to appellant's § 23–110 motion.

the officers awaited a WALES (i.e., Washington Area Law Enforcement System database) check on Hunt.[2] Also according to the written report, during that time, Officers Frost and Jackson told Officer Tighe that "during their sweep of the house they observed in plain view several items that they believed was [*sic*] property taken from [Walker] during the robbery," including "several cigar boxes and some other items." Tighe then went back into the house, this time accompanied by Walker (an entry that the parties and the trial court referred to as the "second entry"). Asked at trial whether he was "given permission to enter the premises at that point," Officer Tighe responded, "Well, there was an officer still there." Inside the house, Walker proceeded to identify various items of property that had been taken from his person or his car. According to Officer Tighe's report, after Walker left the house and after Hunt was arrested, a crime scene search technician took photographs of the scene. Officer Tighe also took some Polaroid photos of the scene and the property and seized the property that Walker had identified. The officers did not see a shotgun, but police returned the next day with a warrant and recovered a sawed-off shotgun from the attic of the house.

On March 26, 2004, the jury returned verdicts finding appellant not guilty of the October incident, but guilty of the December armed robbery of Walker and of the associated weapons charges.[3] In December 2007, appellant filed his D.C.Code § 23–110 motion. He argued that his trial counsel was ineffective in that he failed to file a motion to suppress the evidence seized during the second entry into the home (i.e., all of the physical evidence except the bracelet and the shotgun). At a hearing on December 3, 2008, the trial court assumed that the motion to suppress would have been granted if filed, but told the parties that in its view the remaining evidence against appellant was "overwhelming" and reasoned that appellant therefore was not prejudiced by his counsel's omission and was not entitled to relief (but afforded the parties time to file supplemental memoranda).

On April 15, 2009, the court convened the parties to issue its final ruling. The court told the parties that it would conduct an evidentiary hearing if they wanted, but that it would not hear evidence as to the second entry (i.e., the request for an evidentiary hearing would have "to be based on something in regards to the first time and the third time [i.e., the entry pursuant to the search warrant], but not the second time"). The court did not specifically address the government's argument that some of the evidence recovered during the second entry was admissible because officers had seen the evidence in plain view during their initial entry and could have seized it. Instead, in its brief ruling from the bench, the court said that it "would ... suppress" the evidence from the "second search," distinguishing this case from cases in which "the searching party was already on the scene entitled to be there." The court reasoned, however, that appellant was not prejudiced by his counsel's failure to file a motion to suppress because of the strength of the remaining evidence: the evidence that appellant was found in the house, matched Walker's description of his assailant, and was wearing Walker's bracelet; appellant's "incredible trial testi-

2. After receiving the WALES results, the officers arrested Hunt on the basis of a bench warrant that had been issued for his failure to appear in court on a misdemeanor charge.

3. This court affirmed appellant's convictions in a May 6, 2008 Memorandum Opinion and Judgment.

mony"; and "most importantly[,] the shotgun." This appeal followed.

## II.

 To succeed on an ineffective assistance of counsel claim, a defendant must show (1) that trial counsel made errors so serious that counsel was not functioning as the counsel guaranteed under the Sixth Amendment; and (2) that counsel's deficiency prejudiced the defendant such that it deprived him of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 375, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). To satisfy the prejudice prong, a defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional error[ ], the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. The defendant "need not show, however, that [he] ... would necessarily have been acquitted" in the absence of his attorney's errors. *Frederick v. United States*, 741 A.2d 427, 439 (D.C.1999). A "reasonable probability" of a different outcome is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. When making the prejudice determination, we must "consider the totality of the evidence," including the strength of the evidence supporting the verdict. *Id.*

 Both prongs of the ineffective assistance of counsel inquiry present mixed questions of law and fact. *Strickland*, 466 U.S. at 698, 104 S.Ct. 2052; *see also Cosio v. United States*, 927 A.2d 1106, 1123 (D.C. 2007). We accept the trial court's factual findings unless they lack evidentiary support, and we review the trial court's legal conclusions, including the court's conclusion as to prejudice, *de novo*. *Id.; Mercer v. United States*, 864 A.2d 110, 118 (D.C. 2004).

## III.

### A.

 The focus of appellant's brief on appeal is that the trial court erred in reasoning that he was not prejudiced by his trial counsel's failure to seek suppression of the evidence from the second entry. We address that argument *infra*, but we begin with the government's argument that we can uphold the trial court's denial of appellant's § 23–110 motion on the alternative ground that appellant's trial counsel was not ineffective in failing to file a suppression motion, because the motion would not have been meritorious. Specifically, the government argues that, contrary to the trial court's reasoning, much of the evidence seized during the second entry would have been admissible under the so-called "plain view" doctrine as applied by this court in *Clark v. United States*, 593 A.2d 186 (D.C.1991).

 We described the plain view doctrine in *Umanzor v. United States*, 803 A.2d 983 (D.C.2002), stating that the doctrine "allow[s] the warrantless seizure of evidence observed in plain sight when: (1) an officer [did] not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed; (2) the evidence's incriminating character is immediately apparent; and (3) the officer has a lawful right of access to the object itself." *Id.* at 998–99 (quoting *Horton v. California*, 496 U.S. 128, 136–37,

110 S.Ct. 2301, 110 L.Ed.2d 112 (1990) (internal quotation marks omitted)).

The government urges that *Clark*, in which we applied the plain view doctrine on what the government contends were facts materially similar to the facts of this case, controls the analysis here and warrants affirmance of the trial court's ruling. In *Clark*, we held that a pistol and a clip were admissible under the plain view doctrine where one officer (Officer Cole) had entered an apartment, the scene of a fatal shooting, legally (i.e., in response to an emergency call) and had seen the pistol and clip in plain view, and a crime scene technician later entered without a warrant and seized those items as well as a slug, which the initial officer had not seen. *Clark*, 593 A.2d at 198–99, n. 25. Of primary importance in our analysis were the facts that the initial officer, "who had made a concededly legal" entry, actually saw the pistol and clip and that the initial officer was "still on the scene when the crime scene search officer arrived" and seized the evidence. *Id.* at 197–98.[4] We held that the "seizure" of "items which [were] in plain view during an emergency" was "permissible," *id.* at 197, reasoning that to hold that even though Officer Cole had the right to seize the items, "his colleague acted unlawfully in doing so would improvidently exalt form over substance." *Id.* at 198 (concluding that "where, as in the present case, the responding officers remained on the premises for a reasonable time and were still there when the crime scene search officer seized the items in plain view, the legality of the seizure cannot reasonably be questioned").[5] We were troubled by the admission of the slug, which the initial officer had *not* seen, but we determined that its admission was harmless. *Id.* at 198 n. 25.

The government argues that the facts of this case are analogous to those of *Clark*:

**4.** We distinguished *Douglas–Bey v. United States*, 490 A.2d 1137, 1138–39 (D.C.1985), in which we had held that after an officer who responded to the scene of a murder saw a bloody sports bag in plain view and then left the scene, the plain view doctrine did not apply so as to render admissible the evidence gathered by another officer who arrived later and seized not only the sports bag, but also bullets and evidence of bullet holes. *Clark*, 593 A.2d at 197–98; *see also Douglas–Bey*, 490 A.2d at 1140 ("Hennessy could have stayed on the scene for the short period it took the others to arrive, thus not triggering the warrant clause of the Fourth Amendment." (Nebeker, J., concurring)).

**5.** The government also relies on *Settles v. United States*, 615 A.2d 1105 (D.C.1992). *Settles* involved a motion to suppress a gun found by a detective who arrived at the scene of a murder about 10 to 15 minutes after another police officer had arrived at the scene, checked the house for a suspect and other victims, and cordoned off the house. *Id.* at 1111. At some point in the next 10 to 15 minutes, the MPD homicide branch telephoned the house and told the detective about a report of a gun in the house. *Id.* The detective then found the gun in plain sight in the house. *Id.* We recognized that the officer's initial warrantless entry and limited search in response to the reported shooting, and his continued presence in the house while waiting for the bodies to be removed and in light of the size and behavior of a crowd that had formed outside the house, were lawful. *Id.* We reasoned, however, that even if the exigency that had justified the officer's warrantless entry and limited search had passed by the time the detective arrived and answered the telephone call, the lawfulness of the "limited protective search for the weapon" could not rationally turn on which one— the officer or the detective—took the call and searched for the gun. We said that it would " 'improvidently exalt form over substance' . . . to hold that even though [the officer] could have searched for the gun had he answered the phone, the same search violated the Fourth Amendment because [the detective] answered the phone and hence conducted the search." *Id.* at 1113 (quoting *Clark*, 593 A.2d at 198). Accordingly, we held, the seizure of the gun was not unlawful. *Id.*

The police legally entered the residence and saw inculpatory items in plain view, and (according to Officer Tighe's trial testimony) one of the officers was still in the residence when another officer (Tighe) entered the residence and seized those items. But, on the present record, we are unable to discern how far the analogy extends.

To begin with, even though Officer Tighe's written report recounts that fellow officers told him that "during their sweep of the house they observed in plain view several items that they believed was [*sic*] property taken from [Walker] during the robbery," including "several cigar boxes and some other items," the record does not otherwise disclose how many and which of the items described at trial were seen in plain view during the initial, legal sweep. At trial, while Officer Tighe agreed with the prosecutor that the items Walker identified during the second entry were "items visible in the house without having to engage [in] any type of opening drawers or closets," the officer also testified that at least one item—a "cigar cutter"—was in a drawer (and thus possibly was not in plain view). Additionally, the officer testified about recovery of a "gym type bag ... [that] *contained* cigar boxes and cigar-type products" (emphasis added). The record suggests that some of the other recovered property also might not have been in plain view. For example, Officer Tighe testified that Walker's jacket and scarf were on the sofa and were "covering" other items of Walker's property that the government introduced into evidence. Similarly, Walker testified that a crocheted tissue box with his name on it—a gift from one of Walker's cigar customers, which the government argued "stood out as belonging to [Walker]"—was "sitting underneath the table in the living room" of the home—i.e., possibly not in plain view, or possibly not noticed by the officers during their initial sweep.

 Further, Officer Tighe testified that he brought Walker into the house to "see if he could notice or locate any of his property that had been taken from him." It is not clear whether (and it seems unlikely that) all of the items that Walker "noticed" and identified were ones that the officers conducting the initial sweep had recognized as Walker's allegedly stolen property and thus (possibly) could have been seized under the plain view doctrine. The government—conceding as it did in the trial court that Officer Tighe's re-entry "with the victim" was "not justified by the Fourth Amendment" and acknowledging the illegality of any exploratory "search" that took place during the second entry (as distinguished from Officer Tighe's seizure of items that the officers saw in plain view and recognized as incriminatory during their initial sweep)—agrees that any evidence that was the fruit of the Fourth Amendment violation was inadmissible.[6]

---

6. For the plain view doctrine to apply, the "evidence's incriminating character [must be] immediately apparent." *Umanzor*, 803 A.2d at 998 (internal quotations omitted). If Walker's accompanying police into the house had been lawful, such as in aid of their execution of a search warrant, his identification of property not described in the warrant but in plain sight might have "satisfied the need for the object[s'] incriminating character to be immediately apparent." *PPS, Inc. v. Faulkner Cnty.*, 630 F.3d 1098, 1105 (8th Cir.2011); *see also Wilson v. Layne*, 526 U.S. 603, 611–12, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) ("Where the police enter a home under the authority of a warrant to search for stolen property, the presence of third parties for the purpose of identifying the stolen property has long been approved by this Court and our common-law tradition."); *Spencer v. Roche*, 659 F.3d 142, 150 (1st Cir.2011) (noting that "civilian aid during an authorized search [by one acting as an "agent of the police"] may be appropriate in some circumstances"); *Bellville v. Town of Northboro*, 375 F.3d 25, 33 (1st Cir.2004) ("Where the civilian partici-

In addition, while Officer Tighe testified at trial that "there was an officer still there" when he re-entered the home, the court (not having conducted an evidentiary hearing on appellant's post-trial § 23–110 motion) made no finding on the issue. The point is relevant because our case law has required that the emergency-response officer remain present to justify warrantless entry by evidence-collection officers. *See Settles*, 615 A.2d at 1112 (observing that "[t]he *Clark* court distinguished *Douglas–Bey* on the grounds that in *Douglas–Bey* the officers who seized the evidence had made a new entry onto premises after the officer who made the initial emergency entry had departed. . . ."); *Douglas–Bey*, 490 A.2d at 1140 (observing that the officer who made the initial entry "could have stayed on the scene for the short period it took the others to arrive, thus not triggering the warrant clause of the Fourth Amendment." (Nebeker, J., concurring)).[7] Even if we could take as fact Officer Tighe's testimony about an officer's being "still there" at the time of the second entry, Officer Tighe's written report suggests another divergence from *Clark:* it indicates that, before the second entry occurred, each of the officers at least briefly exited the house in connection with the show-up identifications.[8] Conceivably, the re-entry into the house by the officer who allowed Hunt to return to shelter on that December early morning, but accompanied him back inside, was "no more than an

pating in the execution of a search warrant is the victim of a theft who has been requested by police to point out property that has been stolen from the victim, the courts have unanimously held that the civilian's presence did not affect the propriety of the search.") (citation and internal quotation marks omitted). But, in light of Walker's concededly unlawful participation, we agree that the trial court would have been required to suppress items that police seized based only on Walker's identification.

In Part C.2. *infra,* we discuss why, at least on the present record, we are unwilling to accept appellant's argument that blanket suppression of *all* of the evidence seized during the second entry would have been required.

7. Some courts, by contrast, hold that the re-entry to collect evidence is a mere continuation of the first entry even when no officer from the first entry remains on the scene. *See, e.g., People v. Martin*, 2003 WL 22221964, *4, *5, 2003 Mich.App. LEXIS 2451, *12, *14–15 (Mich.Ct.App. Sept. 25, 2003) (holding that "when police officers enter a private residence pursuant to exigent circumstances and observe evidence in plain view but do not seize the evidence, a subsequent warrantless entry shortly after the first entry to process evidence that could have legally been seized by the officer who first viewed the evidence does not violate the Fourth Amendment" and

that "[i]t would have made little sense to require [the officer who made the initial entry] to remain in the residence until crime lab personnel arrived to assist him in seizing the evidence"); *see also United States v. Hill*, 2011 WL 1486023, *9, 2011 U.S. Dist. LEXIS 42410, *29 (D.Minn. Mar. 31, 2011) (finding it sufficient that, while the officers who saw the evidence in plain view had all exited the dwelling before their re-entry to seize evidence, the re-entry "took place without any break in contact with the scene and within a relatively short time after the initial exigent circumstances" that justified the first entry).

8. Officer Tighe's report indicates that Officer Terrell took Bruce outside for a show-up identification and then placed her "in the back of a transport car"; that Officers Frost and Jackson then took appellant outside for a show-up identification and thereafter placed him "in the back of a separate police transport"; and that Officer Tighe, who had been outside with Walker during the show-up identifications, then went back inside and asked that Hunt be taken outside for a show-up procedure. "An officer," who apparently was back inside the house at the time of Tighe's request, then took Hunt outside. Later, "one of the officers" accompanied Hunt back into the house, and apparently was in the house when Officer Tighe re-entered with complainant Walker and allowed Walker to look around for his property.

actual continuation of the first entry,"[9] justified as necessary to continue ensuring against Hunt's possibly "jumping out with" the shotgun that Walker had described or to preserve the crime scene. But the limited record does not permit us to judge whether, objectively, that officer had a legitimate basis for his continued (or resumed) presence in the house. *Cf. La Fournier v. State*, 91 Wis.2d 61, 280 N.W.2d 746, 750 (1979) ("Whether a subsequent entry is detached from an initial exigency and warrantless entry or is a continuation of the lawful initial entry can be determined only in light of the facts and circumstances of each case.").[10]

In short, in a number of ways, the facts of this case arguably are materially different from those of *Clark*. Given the deficiencies in the factual record, we cannot uphold the court's denial of appellant's § 23–110 motion on the alternative ground urged by the government (i.e., that the motion to suppress that his trial counsel failed to file would not have resulted in the exclusion of evidence).

## B.

■ Nor can we uphold the trial court's ruling by affirming its reasoning that appellant was not prejudiced by his trial counsel's failure to seek suppression of the evidence from the second entry. To the contrary, appellant has persuaded us that the evidence acquired during the second entry "alter[ed] the entire evidentiary picture," and that there is a reasonable probability that without certain portions of it, the jury would not have voted unanimously to convict him.

In particular, appellant argues, the crocheted tissue box with the name "Vincent" on it and the other cigar-related paraphernalia tied him to the robbery of Walker. During his testimony, Officer Tighe identified photographs of those and other items of recovered property (including "several ... wooden cigar boxes" recovered from a bedroom in the house and other cigar boxes found in the dining room), and the court instructed jurors to "pass [the photographs] down one at a time" to "take a close look" at them. During Walker's direct testimony, too, the prosecutor had him describe *seriatim*, and then introduced into evidence, items of his property that he had identified within the house. The prosecutor emphasized this evidence during his opening, closing, and rebuttal arguments. He told the jury in his opening statement that they were "going to see the items that were recovered from the house" and that "when you have an opportunity to see these items you are going to know beyond a reasonable doubt that ... this man is guilty of these charges." The prosecutor finished his closing by telling the jury, "I would bet you a room full of cigars that you know what happened now after all the evidence is in." And, during rebuttal argument, he told the jury that the "evidence in this case is in this box [of recovered items]" and reminded the jury that Walker

9. *Michigan v. Tyler*, 436 U.S. 499, 511, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) (reasoning that where fire personnel entered a building in response to a fire, departed when darkness hindered their work, and then re-entered shortly after daylight to continue their investigation, the warrantless re-entry was lawful as a continuation of the first entry).

10. Appellant asserts that, unlike in *Clark* and *Settles*, "there was no justification for the officers who initially entered the home to remain there" until the entry during which evidence was seized. *But cf., e.g., Lebedun v. State*, 283 Md. 257, 390 A.2d 64, 72 (1978) (agreeing with other courts that later-arriving officers "may join their colleagues even though the exigent circumstances justifying the initial entry no longer exist" (citation and internal quotation marks omitted)).

had identified his property "in plain view" in the house. As we have frequently observed, a prosecutor's emphasis on certain evidence is "at least a highly relevant measure" of the prejudicial impact of that evidence. *Ellis v. United States*, 941 A.2d 1042, 1050 (D.C.2008) (quoting *Andrews v. United States*, 922 A.2d 449, 461 (D.C. 2007)).

The government argues that this evidence was merely "corroborative," and that the bracelet and the shotgun gave the jury all it needed to convict. We agree with appellant, however, that the volume of cigar materials and the tissue box were far more damaging than the bracelet, a more common item that less clearly belonged to cigar-salesman Walker.[11] Jurors could reasonably have doubted that the bracelet appellant was wearing during the show-up identification, which Officer Tighe testified had no identifying marks on it, was Walker's. Or, as appellant argues, jurors could reasonably have suspected that Walker had bartered the generic bracelet as part of a prostitution arrangement. Explaining away the extensive cigar materials and the tissue box with Walker's first name on it doubtless would have been far more difficult.

As the government contends, and as the trial judge recognized, the shotgun recovered from the attic during execution of the search warrant, which matched Walker's description to police of the gun used in the robbery, was an important buttress to the case against appellant. But as appellant argues, recovery of the firearm corroborated Walker's claim that he had been in the home and had seen a firearm, not that he was robbed. The government also cites the trial judge's observation that Walker's testimony was very credible and that, in sharp contrast, appellant's testimony was "incredible" and "contradictory." But we cannot discount the possibility that appellant would not have testified if much or all of the very damaging evidence from the second entry had been suppressed. This is another reason why—if we assume *arguendo* that a motion to suppress evidence seized during the second entry would have succeeded—we cannot say that no prejudice ensued from trial counsel's failure to file such a motion.[12]

### C.

To summarize the foregoing, given the record before us, we cannot affirm the trial court's blanket denial of appellant's § 23–110 motion.[13] Anticipating this re-

---

**11.** Appellant testified that the bracelet belonged to him.

**12.** In discussing prejudice *vel non*, the parties have not distinguished between the evidence the jury saw from photographs of the scene taken by the crime scene technician and photographs of Walker's identified property taken by Officer Tighe (even though, at least arguably, the Fourth Amendment analysis as to the former set of photographs could differ from the analysis as to photographs taken based on Walker's identification of his property during the second entry). Since no such distinction has been "crisply presented to us," *Clark*, 593 A.2d at 199 n. 25, we do not factor such a possible distinction into our analysis here.

**13.** We do agree with the trial court, however, that appellant is not entitled to a new trial on the charge that he possessed an unregistered firearm. We are persuaded by the government's argument that even if the items collected during the second entry were all inadmissible and even if the brief mention of them ("items of property that were positively identified by [Walker] as his property") had been deleted from the search warrant affidavit, (1) probable cause for the warrant still would have been established on the basis of Walker's identification of appellant and appellant's possession of Walker's bracelet, (2) the search warrant still would have been issued, and (3) there would have been no basis for suppressing the shotgun recovered during execution of the warrant.

sult, we asked the parties to submit supplemental briefs addressing whether we should remand this matter for further development of the factual record. In its response, the government noted that because "the trial court indicated that it was essentially going to assume the success of any suppression motion . . ., appellant never had a true opportunity to meet his burden and develop the facts which might have demonstrated inapplicability of the plain-view doctrine." The government asserted that because of this "special circumstance[ ]," "this [c]ourt's pragmatic jurisprudential remand standard counsels in favor of providing appellant a second opportunity for such an evidentiary hearing." Thus, although the government did not initially suggest remand as a possible resolution, it now urges us to remand if we are unable simply to affirm the trial court's ruling.

In sharp contrast, appellant urges that a remand would not be appropriate. Appellant asserts that the government "thrice declined the opportunity to present evidence in the trial court on the precise issue that would be the subject of any remand." Appellant also argues that under *Kimmelman*, in the context of appellant's claim that his trial counsel was ineffective for failing to file a motion to suppress, it was the government's burden to justify the warrantless seizure of evidence (and thus, appellant implies, the government's burden to request an evidentiary hearing).[14] Appellant contends that a remand inappropriately would give the government a "second bite at the apple." Finally, appellant argues that under *Giordenello v. United States,* 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958), the "exceptional course" of a remand would be inappropriate since there are no "special circumstances" to justify it.[15] *Id.* at 488, 78 S.Ct. 1245. In particular, appellant cites the Supreme Court's statement in that case that it would not be "sound judicial administration to send the case back to the [trial court]" where "[t]he facts on which the Government now relies . . . were fully known to it at the time of trial, and there are no special circumstances suggesting such an exceptional course." *Id.*

For the reasons that follow, we think the government has the better of the argument.

**1.**

The procedural record is less one-sided and more complicated than appellant asserts. As appellant emphasizes, the government did repeatedly decline the opportunity for a hearing. But the prosecutor told the court initially that if the court was "not inclined" to "deny the 23[-]110 just

---

14. Appellant relies on the following passage in *Kimmelman*:

No evidentiary hearing has ever been held on the merits of respondent's Fourth Amendment claim. Because the State has not conceded the illegality of the search and seizure, . . . it is entitled to an opportunity to establish that [the] search came within one of the exceptions we have recognized to the Fourth Amendment's prohibition against warrantless searches.

*Kimmelman,* 477 U.S. at 390–91, 106 S.Ct. 2574.

15. In *Giordenello,* the Supreme Court applied 28 U.S.C. § 2106, which the parties agree is the analogue to D.C.Code § 17–306 (2001), the source of this court's remand authority to, *inter alia,* "remand the cause and . . . require such further proceedings to be had, as is just in the circumstances." *See also Foster v. United States,* 290 A.2d 176, 179 n. 6 (D.C. 1972) (noting that § 17–306 . . . confers authority on this court in identical terms to section 2106); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 29, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) ("Title 28 U.S.C. § 2106 gives a court of appeals some latitude in entering an order to achieve justice in the circumstances.").

based on the papers and our argument here today," then "I think we are in a position of probably both of us wanting a, I guess a hearing on some issue. I don't know whether it has to be on all the issues that are raised because there's [sic] so many parts of this fourth amendment analysis." Appellant likewise repeatedly (we count five or six times) declined the opportunity for a hearing, and the parties ultimately jointly advised the court that the motion could be resolved without an evidentiary hearing (appellant apparently misapprehending the government to be abandoning its position that the evidence seized during the second entry was admissible).[16] The parties did so after the court had made it all but certain that it would rule that, because the government's evidence was "overwhelming," appellant could not show prejudice from his trial counsel's failure to file a motion to suppress. In that circumstance, the government understandably did not request an evidentiary hearing. Moreover, as described above, at the April 15, 2009 hearing, the court told the parties that it would not hear evidence about the second entry.

2.

In appellant's view, *Kimmelman* makes clear that the government bore the burden of establishing that the evidence seized during the second entry need not have been excluded. Appellant argues that the government should not be permitted to avoid the consequences of its choice not to insist on an evidentiary hearing to elicit

facts in support of its claim that the evidence was admissible. There are several reasons why we are not persuaded by this argument. First, the language in *Kimmelman* on which appellant relies ("the State ... is entitled to an opportunity to establish that [the] search came within one of the exceptions we have recognized to the Fourth Amendment's prohibition against warrantless searches," 477 U.S. at 390–91, 106 S.Ct. 2574) appears to be dictum. The Court made its comment in the portion of its opinion in which it rejected respondent's argument that the record was "sufficiently complete to enable th[e] Court to apply *Strickland's* prejudice prong directly" without a remand. *Id.* at 390, 106 S.Ct. 2574. The Court upheld the decision of the U.S. Court of Appeals for the Third Circuit to remand on the ground that the record was "incomplete with respect to prejudice." *Id.* In addition to observing that "[n]o evidentiary hearing ha[d] ever been held on the merits of respondent's Fourth Amendment claim," *id.*, the Court noted that "respondent may be unable to show that absent the evidence [that respondent claimed should have been suppressed,]there is a reasonable probability that the trial judge would have had a reasonable doubt as to his guilt." *Id.* at 391, 106 S.Ct. 2574. This shows that the Court's remark on which appellant relies was "not necessary for the disposition of the case," and therefore is "not binding on us." *Holiday v. United States*, 683 A.2d 61, 101 n. 16 (D.C.1996).[17]

16. We see no basis for appellant's assertion that the government "abandoned" that position. As far as the trial court transcripts and pleadings disclose, during the proceedings in the trial court, while the government conceded that the entry "with the victim" and any "searching" during that entry were unlawful, it consistently took the position that certain items that were in plain view (and that the officers recognized as incriminating) during their first entry were admissible, even

though the items were not actually seized until the second entry.

17. We also note that in the twenty-five years since *Kimmelman* was issued, not a single reported case has quoted the language on which appellant relies. Appellant informs us that the Third Circuit "has twice concluded, consistent with *Kimmelman*, that even though a defendant has the burden of proving *Strickland* prejudice, when considering the subsid-

While Supreme Court dictum is "entitled to high respect from an inferior tribunal," *United States v. Poindexter*, 727 F.Supp. 1501, 1505 (D.D.C.1989), in this case there is a particular reason to take the dictum in *Kimmelman* on which appellant relies with a large grain of salt: the difficulty we face in reconciling that dictum with the Supreme Court's recognition earlier in the opinion that "[w]here defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the *defendant* must ... prove that his Fourth Amendment claim is meritorious...." *Id.* at 375, 106 S.Ct. 2574 (italics added).[18]

Further, this court has said that "while in a pretrial suppression hearing, the burden is placed on the government, the situation is reversed on collateral attack." *Wright v. United States*, 608 A.2d 763, 765 n. 7 (D.C.1992). Appellant denigrates this statement as a non-holding "unaccompanied by explanation or legal citation." Appellant may be correct that this court "has never focused [at any length] on the question of whether the government bears the burden of justifying a warrantless search or seizure when the issue is raised through an ineffectiveness claim for trial counsel's failure to file a motion to suppress." For present purposes, however, it is enough to observe that, in light of what we said in *Wright*, the government had good reason for thinking that appellant had the burden to show that the omitted motion to suppress would have resulted in exclusion of evidence.[19] The government also had good

iary issue of whether a motion would have been successful, the same burdens apply as would have applied at a motions hearing at the time of trial had competent counsel properly litigated the issue." It is telling, however, that in neither case that appellant cites (*Thomas v. Varner*, 428 F.3d 491, 503 (3d Cir.2005), and *Government of the Virgin Islands v. Forte*, 865 F.2d 59, 65 (3d Cir.1989)) did the Third Circuit rely on *Kimmelman* for the point. Nor has appellant brought to our attention any other case that relies on *Kimmelman* for the point in issue here.

We also observe that, whether dictum or not, the statement in *Kimmelman* on which appellant relies does not imply that, here, the government bore the burden of proving facts pertinent to whether the plain view doctrine is applicable. Again, the statement in *Kimmelman* suggests that, in the context of an ineffective-assistance-of-counsel motion, the government has the burden to establish facts necessary for the applicability of "one of the *exceptions* ... to the Fourth Amendment's prohibition against warrantless searches." 477 U.S. at 390–91, 106 S.Ct. 2574 (italics added). However, as the Supreme Court recognized in an opinion issued just a few years prior to *Kimmelman*, " '[p]lain view' is perhaps better understood, ... not as an independent 'exception' to the Warrant Clause, but simply as an extension of whatever the prior justification for an officer's 'access to an

object' may be." *Texas v. Brown*, 460 U.S. 730, 738–39, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (explaining that " 'plain view' provides grounds for seizure of an item when an officer's access to an object has some prior justification under the Fourth Amendment[ ]"). In other words, notwithstanding courts' (including this court's) frequent reference to the plain view "exception" to the warrant requirement, the plain view doctrine is not "one of the exceptions" to which the Court made reference in *Kimmelman*.

18. It is also difficult to reconcile appellant's acknowledgment that he bore the burden of showing that the omitted motion to suppress "would have been successful" with his claim that the government bore the burden of proof on Fourth Amendment issues during the § 23–110 proceedings.

19. And, if the plain view doctrine applies in this case, it is in part because the *first* entry, during which the officers saw in plain sight some of Walker's property, was lawful. *See Brown*, 460 U.S. at 737, 103 S.Ct. 1535 (explaining that the question whether property in plain view may be seized turns in part on the legality of the intrusion that enabled police to perceive the property in the first place). As appellant urged in the trial court, whether that entrance was lawful depended in large part on whether the first entry was justified

reason for thinking that the burden to request any evidentiary hearing necessary to make that showing lay with appellant.[20]

Appellant's contention that, in any event, he met any burden he had of showing that a motion to suppress "would have been successful" merely by "demonstrat[ing] that the items were seized during a warrantless search" is not convincing. Under *Clark,* on the assumption that Officer Tighe's warrantless re-entry occurred while another officer justifiably was "still there," *Tighe's* re-entry to seize items that were in plain view during the initial entry did not involve any additional intrusion on privacy.[21] While we will not relieve the government of its concession that Officer Tighe's re-entry "with the victim ... was not justified by the Fourth Amendment," we see no reason why, without more, that Fourth Amendment violation should require the suppression of the evidence that the officers could have seized during their initial entry (and that Officer Tighe could have seized during a solo re-entry) on the basis of the plain-view doctrine. "[T]he general rule is that only those items which were unconstitutionally seized are to be suppressed; those which were constitutionally seized may stand." *Klingenstein v. State,* 330 Md. 402, 624 A.2d 532, 536 (1993). Blanket suppression of seized evidence may be warranted where police have shown "a flagrant disregard" for the limitations of their authorized search, such as by searching "as if no limiting warrant existed, rummaging at will among defendants' offices and files[.]" *United States v. Heldt,* 668 F.2d 1238, 1259 (D.C.Cir.1981). Otherwise, "only the improperly-seized evidence will be suppressed; the properly-seized evidence remains admissible." *United States v. Srivastava,* 540 F.3d 277, 293 (4th Cir.2008) (citation and internal quotation marks omitted).[22] On the pres-

by exigent circumstances (as the trial court reasoned), or, if not, whether the officers had Bruce's consent to enter and perform a protective sweep. Yet, as described *supra,* appellant repeatedly waived the opportunity for an evidentiary hearing focused on the issues of consent and exigent circumstances, relying instead on his claim that "regardless of the legality of that first entry, we're at the point where the second entry was concededly illegal." Appellant argues that the government "purposefully left the record entirely undeveloped on precisely the types of issues that would be critical to any 'plain view' analysis by this [c]ourt," but that criticism can equally be leveled against appellant.

instant case and *Aiken* (in which we remanded for an evidentiary hearing in the first instance regarding whether the prosecution had made use of immunized testimony), the most apropos point may be that in *Aiken,* "the judicial mind [was not] applied to" and we did not "pass[ ] upon the precise question" presented here. *Murphy v. McCloud,* 650 A.2d 202, 205 (D.C.1994) (citation and internal quotation marks omitted); *see also Webster v. Fall,* 266 U.S. 507, 511, 45 S.Ct. 148, 69 L.Ed. 411(1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.").

20. In a Rule 28(k) letter and at re-argument, appellant cited this court's decisions in *Aiken v. United States,* 956 A.2d 33, 49–50 (D.C. 2008), and *Aiken v. United States,* 30 A.3d 127 (D.C.2011), as demonstrating that, when a hearing is held pursuant to a § 23–110 motion that alleges that trial counsel was ineffective for failing to move to preclude the government from using certain evidence at trial, the government bears the burden of proof regarding specific legal issues. Whatever other distinctions can be drawn between the

21. As the government argued to the trial court, it would "exalt form over substance" to argue that it was improper for Tighe to seize cigar-related items that were in plain view during the initial sweep and that the officer who was "still there" could have seized.

22. *Cf. Brooks v. United States,* 367 A.2d 1297, 1311 (D.C.1976) (reasoning that where, after arresting Brooks, officers conducted a warrantless search and seized evidence from several places in his apartment, the trial court

ent record, we cannot say that complainant Walker's entry with police into the house he had entered with Bruce's consent just an hour or so earlier and the scope of what police allowed him to do within the house (according to Officer Tighe's written report, "look around the house" "to see if he could identify the property as being his") involved such a flagrant disregard for the privacy of the home that it should affect the admissibility of the property that Officer Tighe could have seized. We know of no authority that requires us to hold otherwise, and we also see no reason to "put the police in a worse position than they would have been in if no unlawful conduct had transpired." *Nix v. Williams,* 467 U.S. 431, 445, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Thus, on the record before us, we cannot say that appellant met his burden of showing that a motion to suppress "would have been successful" as to a significant quantum of evidence merely by "demonstrat[ing]" that the items were seized during a warrantless search."

### 3.

We also cannot agree with appellant that *Giordenello* requires us to recognize that a remand would be inappropriate here. Giordenello claimed that his arrest pursuant to a warrant was illegal because the complaint on which the warrant was issued was defective. 357 U.S. at 484, 78 S.Ct. 1245. He moved to suppress heroin found in his bag at the time of his arrest, but the district court denied his motion after an evidentiary hearing. *Id.* at 482, 78 S.Ct. 1245. In the trial court and on appeal, the government "defended the le-

gality of petitioner's arrest by relying entirely on the validity of the warrant." *Id.* at 487, 78 S.Ct. 1245. The government did not prevail on that issue, as the Supreme Court agreed that the complaint was "defective in not providing a sufficient basis upon which a finding of probable cause could be made." *Id.* at 485, 78 S.Ct. 1245. However, before the Supreme Court, the government also advanced a new "principal contention": that "Texas law permit[ted] arrest without a warrant upon probable cause that the person arrested has committed a felony," and that on the basis of facts to which the arresting officer had testified in the district court, the officer "must be deemed, within the standards of Texas law, to have had the probable cause necessary to arrest petitioner without a warrant." *Id.* at 488, 78 S.Ct. 1245. The Court stated that these "belated contentions [were not] open to the Government" and refused "[t]o permit the Government to inject its new theory into the case at this stage." *Id.* The Court said that doing so would "unfairly deprive petitioner of an adequate opportunity to respond ... because in the District Court petitioner, being entitled to assume that the warrant constituted the only purported justification for the arrest, had no reason to cross-examine [the arresting officer] or to adduce evidence of his own to rebut the contentions that the Government" made for the first time in the Supreme Court. *Id.* It was in that context that the Court added that it would not be "sound judicial administration to send the case back to the District Court for a special hearing," because "[t]he facts on which the Govern-

---

would need to determine which items of evidence "f[e]ll within the proper limits of the plain view doctrine" (and thus were admissible) and "which items should be considered inadmissible"); *Clark,* 593 A.2d at 198 n. 25 (finding it unnecessary to decide whether the legality of the evidence-collection officer's

warrantless seizure of a slug that the emergency-response officer had not noticed in plain sight, where the warrantless seizure of incriminating items that the emergency-response officer *had* seen was justified under the plain view doctrine, and admission of slug, if error, was harmless).

ment now relies to uphold the arrest were fully known to it at the time of trial, and there are no special circumstances suggesting such an exceptional course."

The pertinent facts here differ significantly from those of *Giordenello.* Unlike in *Giordenello,* the theory that the government has advanced on appeal is not a new one. The government repeatedly argued in its trial court pleadings that the evidence seized during the second entry was admissible under the plain view doctrine even though the second entry itself was unlawful. Thus, the instant case is not one in which the government "failed to raise [the argument it advances on appeal] in a timely fashion during the litigation." *Steagald v. United States,* 451 U.S. 204, 208–09, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) (relying on the fact that the government's argument that the defendant "lacked a reasonable expectation of privacy in the searched home" "was never raised by the Government in the courts below"). Second, in *Giordenello,* an evidentiary hearing was actually held, and, unaware of the government's "new" theory, Giordenello forwent an opportunity to cross-examine the arresting officer and was not alerted to the need to develop evidence to rebut the government's theory. In this case, by contrast, appellant declined the opportunity for a hearing even after receiving the government's July 2008 opposition to the § 23–110 motion, in which the government relied on the plain view doctrine. Appellant also was alerted to the need to adduce evidence pertinent to the issue in case the government were to have requested a hearing. Against this background, we are not persuaded that a remand for an evi-

dentiary hearing would be an "exceptional course" or that we must have "special circumstances" to order a remand.

But even if we assume *arguendo* that "special circumstances" were a prerequisite to a remand, we could find them here, on several bases: because of the approach that the trial court took (i.e., merely assuming that the evidence would have been suppressed and focusing instead on the government's "overwhelming" evidence to conclude that suppression would not have made a difference in the outcome of appellant's trial; and affording the parties a last opportunity to have an evidentiary hearing regarding the first and third entries, but not the second); the lack of certainty about which party bore the burden to request a hearing to establish facts pertinent to resolution of the Fourth Amendment claim; and what appears to be appellant's misunderstanding about the government's having "abandoned" in the trial court its claim that some of the seized evidence was admissible under the plain view doctrine.

## IV.

We conclude that a remand procedure such as we ordered in *Brooks* is the appropriate resolution. There we said that because the "incompleteness of the record preclude[d] a proper determination" of the admissibility of the evidence in question, 367 A.2d at 1311, we would remand the case for an evidentiary hearing.[23] Analogous to what we instructed in *Brooks,* we direct that the hearing "shall be limited to the development of sufficient facts to permit rulings as to whether the discovery and taking [of the evidence seized during

---

**23.** *See also McFerguson v. United States,* 770 A.2d 66, 76 (D.C.2001) ("Because the judge ruled that the search of the bag was supported by probable cause, he did not reach the question of inevitable discovery and so had no occasion to make findings of fact concerning [the officer's] identification that bear on that issue. Accordingly, in the interests of justice, see D.C.Code § 17–306 ..., we will remand the record for consideration by the judge of the inevitable discovery doctrine[.]" (footnote signal omitted)).

the second entry] fall within the proper limits of the plain view doctrine." *Id.* at 1311. This should include development of the facts as to (1) whether another officer was still in the house at the time Officer Tighe re-entered with Walker; (2) if so, what the facts or circumstances were that might (or might not) have justified the officer's resumed presence in the house as a continuation of the first entry; and (3) specifically which items the officers saw and immediately recognized as incriminating during the first entry.[24] The trial court "should make determinations as to (1) which [ (if any) ] items should be considered inadmissible," *id.*, and (2) whether the nature or number of any item or items that were not admissible establishes a reasonable probability that the outcome of appellant's case would have been different if the item(s) had been suppressed. "If the latter question is answered in the [positive], a new trial [on the robbery and PFCV charges] should be ordered." *Id.*

Accordingly, we vacate the judgment of the trial court denying appellant's § 23-110 motion, and we remand the matter for further proceedings consistent with this opinion.

*So ordered.*

NEWMAN, Senior Judge, dissenting:

While I concur totally with the majority's holding that the trial court committed reversible error in denying Porter's post-trial motion under D.C.Code § 23-110, I emphatically dissent from its decision to remand for an evidentiary hearing on the alleged "plain view" issue.

This case was first argued with Judge Kramer as a member of the division. I was drawn to replace her when she re-

tired, the case was set for reargument, and, at my request, the parties were directed by the court to file supplemental briefs to address four questions. They were:

(1) Assume that we find that the trial court erred in holding on the record before it that the second prong of *Strickland v. Washington*, 466 U.S. 668 [104 S.Ct. 2052, 80 L.Ed.2d 674] (1984), was not satisfied; and assume further that we decide that the record before us is insufficient to sustain the "second search" under the "plain view" doctrine; should we remand for an evidentiary hearing on the "plain view" issue?

(2) By what jurisprudential standard (legal test versus ad hoc) should we determine whether a remand for an evidentiary hearing is appropriate in cases such as this? *See, e.g., McFerguson v. United States*, 770 A.2d 66 (D.C.2001); *Barnett v. United States*, 525 A.2d 197 (D.C.1987); *Brooks v. United States*, 367 A.2d 1297 (D.C.1976); D.C.Code § 17-306 (2001).

(3) Should the jurisprudential standard referenced in (2) above be different where the issue is before us on direct appeal as in *McFerguson, Barnett,* or *Brooks,* or is before us, as in this case, on appeal, from a ruling on a post-trial motion?

(4) If so, why so? What should be the jurisprudential standard when we are reviewing this type for denial of post-trial relief, as is this case?

The parties submitted briefs addressing each of the questions; I have found these briefs particularly helpful in addressing these questions.

---

**24.** Whether the officer's resumed presence in the house was lawful may also depend on whether exigent circumstances justified the first entry. This, too, will be a proper focus of the evidentiary hearing.

Our remand authority emanates from D.C.Code § 17–306 (2001). As the United States says in its brief, Congress patterned § 17–306 upon 28 U.S.C. § 2106 (2006), and intended § 17–306 to be virtually identical to § 2106. As we have held, § 17–306 "confers authority on this court in identical terms to section 2106." *Foster v. United States*, 290 A.2d 176, 178 n. 6 (D.C.1972); *accord, Gathy v. United States*, 754 A.2d 912, 915 (D.C.2000).

The Supreme Court construed the provisions of 28 U.S.C. § 2106 in *Giordenello v. United States*, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958). There, it established the jurisprudential standard which guides the exercise of discretion,[1] by federal appellate courts, including the Supreme Court, in deciding whether to remand a case for an evidentiary hearing in situations such as those present in this case. That standard is: are there "special circumstances suggesting such an exceptional course." *Giordenello, supra*, 357 U.S. at 488, 78 S.Ct. 1245. In *Steagald v. United States*, 451 U.S. 204, 208–09, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), the Court discusses a situation which meets this jurisprudential standard. *See also United States v. Shotwell Mfg. Co.*, 355 U.S. 233, 236–41 & n. 17, 78 S.Ct. 245, 2 L.Ed.2d 234 (1957) (cited with approval in *Giordenello*); *Whiteley v. Warden, Wyoming State Penitentiary*, 401 U.S. 560, 568–69, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971).

This standard has been followed by the various United States Courts of Appeal, see, for example, *United States v. Archibald*, 589 F.3d 289, 296 (6th Cir.2009); *United States v. Nee*, 261 F.3d 79, 86–87 (1st Cir.2001); *United States v. Leonzo*, 311 U.S.App.D.C. 134, 136, 50 F.3d 1086, 1088 (1995); *EEOC v. Westinghouse Elec. Corp.*, 925 F.2d 619, 628–29 (3d Cir.1991); *United States v. Thompson*, 710 F.2d 1500,

1503–04 (11th Cir.1983); and the highest court of several states, see, for example, *State v. Bell*, 334 Md. 178, 638 A.2d 107, 114 (1994); and *People v. Shuey*, 13 Cal.3d 835, 120 Cal.Rptr. 83, 533 P.2d 211, 219 n. 4 (1975), *abrogated on other grounds in Segura v. United States*, 468 U.S. 796, 799, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984).

Where our D.C. statute, rule or the like, is substantially identical to a federal counterpart, we look to the federal counterpart as persuasive authority. *See, e.g., Kumar v. District of Columbia Water & Sewer Auth.*, 25 A.3d 9, 16–17 (D.C.2011) (holding that in interpreting the D.C. Human Rights Act we look to federal jurisprudence interpreting Title VII of the Civil Rights Act of 1964); *United States v. Little*, 851 A.2d 1280, 1282 n. 1 (D.C.2004) (concluding that in construing D.C.Code § 23–110 we rely on federal jurisprudence construing 28 U.S.C. § 2255); *Wittenberg v. United States*, 366 A.2d 128, 129, 132 & n. 5 (D.C.1976) (applying District embezzlement statute consistent with federal embezzlement statute); *see also* Appendix (listing our cases to like effect covering a vast variety of statutes and rules).

Our previous decisions which do not reference 28 U.S.C. § 2106 (2006) and such cases as *Giordenello* and its progeny when deciding remand questions pursuant to our authority under § 17–306, such as *McFerguson v. United States*, 770 A.2d 66 (D.C. 2001), *Barnett v. United States*, 525 A.2d 197 (D.C.1987), *Brooks v. United States*, 367 A.2d 1297 (D.C.1976), do not impair our ability to invoke 28 U.S.C. § 2106 now to construe § 17–306. *See District of Columbia v. Sierra Club*, 670 A.2d 354, 360 (D.C.1996); *Murphy v. McCloud*, 650 A.2d 202, 205 (D.C.1994) ("The rule of *stare decisis* is never properly invoked unless in the decision put forward as precedent the

---

1. *See Johnson v. United States,* 398 A.2d 354 (D.C.1979).

judicial mind has been applied to and passed upon the precise question.") (internal quotation marks omitted). There is no indication that we have ever previously considered the applicability of the federal analogue to our jurisdictional authority under § 17–306. We should explicitly hold here that 28 U.S.C. § 2106 and cases construing it are "persuasive authority" for us in construing § 17–306; plainly put, we should follow *Giordenello* and its progeny.[2]

Contrary to the picture painted by the majority, the United States had a full and fair *opportunity* to litigate the plain view issue before Judge Ross. A more detailed recitation of the trial court proceedings than done in the majority opinion is necessary to show what occurred. In his § 23–110 motion, in so far as relevant to our decision, Porter challenged both the original warrantless entry into the premises where he, and the only other two persons present there were removed for identification proceedings and a third warrantless entry and search where the robbery proceeds at issue were seized. In its opposition to Porter's motion, the United States *conceded* that the third entry had been unlawful. As the United States stated with respect to this entry in its opposition to the motion: "[T]he police's re-entry with the victim into [the] house was not justified by the Fourth Amendment given that [Bruce] consented only to the police's initial entry into her home and to their request that they be permitted to check the home to see who was there. *See Florida v. Jimeno*, 500 U.S. 248, 252, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) ("[A] suspect may of course delimit as he chooses the scope of the search to which he consents."). However, we disagree that this would have entitled defendant to any relief if a motion to suppress had been filed."

The government propounded two grounds for this contention: (1) "inevitable discovery," and/or (2) the items could have been seized under the "plain view" doctrine during the initial entry. Judge Ross rejected both these asserted bases.[3] That concession by the United States that the third entry could not be justified constitutionally on other grounds consistent with the Fourth Amendment was also required, as will be further explicated hereafter in my discussion of *Michigan v. Tyler*, 436 U.S. 499, 511–12, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), as it relates to the plain view doctrine.

Judge Ross scheduled a hearing on Porter's motion; prior to the hearing he caused his chambers to inquire of both parties whether either desired an evidentiary hearing.[4] *Both* parties indicated they

---

2. In answer to the third question we posed to the parties for supplemental briefing and reargument, i.e., whether the jurisprudential standard we should apply is "different where the issue is before us on direct appeal ... from a ruling on a post-trial motion," both parties agreed that the same jurisprudential standard is applicable in both direct appeals and on post-trial motions such as in this case. So do I.

3. In its opposition to Porter's motion, the government devoted four pages to "inevitable discovery" and only three-quarters of a page to "plain view" (citing only *Umanzor v. United States*, 803 A.2d 983 (D.C.2002)). On this appeal, the government correctly abandons any relevance on inevitable discovery. *See McFerguson, supra*, 770 A.2d at 74–77. The short answer to the contention that the items "could have" been seized during the first entry under the plain view doctrine is that they *were not* seized then.

4. At the outset of the first hearing before Judge Ross on December 3, 2008, Judge Ross stated:

I did want to put on the record that I offered both parties the opportunity to present live witnesses for an evidentiary hearing to supplement the record. It was my understanding through my law clerk that neither party wanted to call witnesses and that

did not. During the hearing, the United States *did not* raise the plain view issue. Post-hearing, the United States filed a supplemental pleading again raising the plain view issue. In his response, Porter protested what he claimed was a change of position by the government, and most importantly for our purposes, asserted if the United States desired to assert a "plain view" rationale, an evidentiary hearing was necessary to elucidate that issue. In response, the government stated that it maintained its view that the third entry and search was illegal.

After Judge Ross scheduled a hearing for April 15, 2009 (a hearing that, it appears, the parties contemplated might encompass an evidentiary hearing), the United States and Porter filed a "Joint Motion" to vacate that hearing. In that joint motion, the United States reiterated what it had said in its Opposition to Porter's Motion to Vacate Sentence motion ("[T]he police's re-entry ... was not justified by the Fourth Amendment."), and in its Sur–Reply to Porter's Reply to its Opposition ("[W]e maintain our view that the second search was illegal."), by yet again informing Judge Ross that the government was not now claiming that the third entry and search was legal and further vowing that "[t]his remains *and will remain,* the position of the United States" (emphasis added).

The joint motion further stated: "The parties recently have conferred about this matter and agree that the remaining issues to be resolved are legal ones—i.e. the same issues that were before the Court at the conclusion of the December 3, 2008 hearing. Because resolution of those issues does not require the taking of evidence, the parties jointly request that the Court vacate the April 15, 2009, hearing in this case."

The record thus indicates that wherever the government asserted the plain view rationale, Porter pointed out to Judge Ross the need for an evidentiary hearing so that he could "confront the witnesses." Each time (according to my count, at least "thrice") in the face of such assertion of rights, the United States eschewed such an evidentiary hearing, indicating to Judge Ross and to Porter that the United States was willing to rely ("gamble"?) on Judge Ross's willingness to deny the motion on the ground that both the majority and I now reject.[5]

Sound jurisprudence cautions against remands for such "second bites" as the majority orders here. The evidence on which the government seeks to rely to uphold the search was fully known to the government at the time of the post-trial hearing. Because this is so, we should say as the U.S. Court of Appeals for the Third Circuit did in *EEOC v. Westinghouse Electric Corp.:*

the parties just wanted to ... have oral argument.

It is only fair to note that although we agree and hold that Judge Ross erred in his ultimate ruling, he did all that a judge could be expected to do to afford the United States an opportunity to proceed with an evidentiary hearing. The United States elected to eschew these opportunities. As I set forth later in my discussion of *Michigan v. Tyler, supra,* given the concessions by the United States, Porter had no need for an evidentiary hearing.

**5.** That the United States did not deem the proceedings of Judge Ross with respect to an

evidentiary hearing as depriving it of anything it desired is perhaps demonstrated by its failure, in its briefing before the original merits division in this case, to request that if we found the record before us insufficient to sustain Judge Ross on the alternative rationale of "plain view," that we then remand the record (or case) to the trial court for an evidentiary hearing. In my view, this is of particular significance when one realizes the paucity of evidence in the record before us relevant to this issue.

where a party "simply chose for tactical reasons, of its own accord, not to pursue grounds for relief that it had[,] ... we cannot remand." 925 F.2d 619, 628 (3d Cir.1991); *accord, e.g., Leonzo, supra,* 311 U.S.App.D.C. at 136, 50 F.3d at 1088; *Thompson, supra,* 710 F.2d at 1503–05. What the United States Court of Appeals for the District of Columbia said in an analogous (albeit not identical) circumstance bears repeating here:

> In our jurisprudential system, trial and appellate processes are synchronized in contemplation that review will normally be confined to matters appropriately submitted for determination in the court of first resort. Questions not properly raised and preserved during the proceedings under examination, and points not asserted with sufficient precision to indicate distinctly the party's thesis, will normally be spurned on appeal. Canons of this tenor reflect, not obeisance to ritual, but considerations of fairness to the court and the parties and of the public interest in bringing litigation to an end after fair opportunity has been afforded to present all issues of law and fact. The injunction that trial ventilation precede appellate exploration best subserves that policy without appreciable imposition upon the litigants. It requires them to deal fairly and frankly with each other and with the trial tribunal with respect to their controversies. It prevents the trial of cases piecemeal or in installment. It tends to put an end to litigation. We think that sound judicial administration embraces importantly the elimination of expenditures of time and energy—by parties as well as courts—incidental to potentially unnecessary appeals.

*Miller v. Avirom,* 127 U.S.App.D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967) (footnotes omitted) (internal quotation marks omitted).

In our prior cases where we have remanded for further proceedings relating to suppression issues such as present in this case, there always had been evidentiary hearings on the suppression motions. This is so in each of the comparable cases I have found, *McFerguson v. United States,* 770 A.2d 66 (D.C.2001); *Martin v. United States,* 567 A.2d 896 (D.C.1989); *Barnett v. United States,* 525 A.2d 197 (D.C.1987); *Brooks v. United States,* 367 A.2d 1297 (D.C.1976). In each of those cases we determined that the trial court had failed to make adequate findings of fact based on that evidentiary record to enable us to perform our appropriate appellate review. We remanded for such further findings of fact.[6] My research has found no case from this court where we have remanded for a *de novo* evidentiary hearing where none previously had been conducted as the majority authorizes in this case; neither the United States nor the majority cite one.

### Plain View

### The Doctrine

The "plain view" doctrine was explicated by Justice Stewart, writing for the Supreme Court in *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). There the Court enunciated a number of points critical to our consideration.

> It is well established that under certain circumstances the police may seize evidence in plain view without a warrant. But it is important to keep in mind that, in the vast majority of cases, any evi-

---

**6.** In *McFerguson,* we left to the discretion of the trial judge whether to conduct a further evidentiary hearing. 770 A.2d at 76.

dence seized by the police will be in plain view, at least at the moment of seizure. The problem with the "plain view" doctrine has been to identify the circumstances in which plain view has legal significance rather than being simply the normal concomitant of any search, legal or illegal.

An example of the applicability of the "plain view" doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character.... Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate. Thus the police may inadvertently come across evidence while in "hot pursuit" of a fleeing suspect.... And an object that comes into view during a search incident to arrest that is appropriately limited in scope under existing law may be seized without a warrant.... Finally, the 'plain view' doctrine has been applied where a police officer is not searching for evidence against the accused, but nonetheless inadvertently comes across an incriminating object.

What the "plain view" cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused—and permits the warrantless seizure. Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the "plain view" doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges.

The rationale for the "plain view" exception is evident if we keep in mind the two distinct constitutional protections served by the warrant requirement. First, the magistrate's scrutiny is intended to eliminate altogether searches not based on probable cause. The premise here is that any intrusion in the way of search or seizure is an evil, so that no intrusion at all is justified without a careful prior determination of necessity.... The second, distinct objective is that those searches deemed necessary should be as limited as possible....

The "plain view" doctrine is not in conflict with the first objective because plain view does not occur until a search is in progress. In each case, this initial intrusion is justified by a warrant or by an exception such as "hot pursuit" or search incident to a lawful arrest, or by an extraneous valid reason for the officer's presence. And, given the initial intrusion, the seizure of an object in plain view is consistent with the second objective, since it does not convert the search into a general or exploratory one. As against the minor peril to Fourth Amendment protections, there is a major gain in effective law enforcement. Where, once an otherwise lawful search is in progress, the police inadvertently come upon a piece of evidence, it would often be a needless inconvenience, and sometimes dangerous—to the evidence or to the police themselves—to require them to ignore it until they have ob-

tained a warrant particularly describing it.

The limits on the doctrine are implicit in the statement of its rationale. The first of these is that plain view alone is never enough to justify the warrantless seizure of evidence. . . .

*Coolidge, supra,* 403 U.S. at 465–71, 91 S.Ct. 2022 (footnotes and citations omitted); *see also Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); *Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987).

Justice Scalia, writing for the Court, further explicated the doctrine in *Hicks.* There he held that to seize items under the plain view doctrine, probable cause to seize the item is required. "To hold otherwise would be to cut the plain view doctrine from its theoretical and practical moorings." *Hicks, supra,* 480 U.S. at 326, 107 S.Ct. 1149.

A further requirement for application of the plain view doctrine is that the evidence must be seized during a constitutionally permissible entry. *Michigan v. Tyler,* 436 U.S. 499, 511–12, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) (concluding evidence seized during unlawful entry into premises is obtained in violation of Fourth Amendment); *Coolidge, supra,* 403 U.S. at 443, 470–71, 91 S.Ct. 2022 ("[W]here the police know in advance the location of the evidence and intend to seize it, the situation is altogether different[, and a warrant is required.]"); *accord, Douglas–Bey v. United States,* 490 A.2d 1137, 1138–39 (D.C.1985); *Shamaeizadeh v. Cunigan,* 338 F.3d 535, 549 (6th Cir.2003) ("Although the plain view doctrine would likely have justified Wiles's seizure of immediately incriminating drug paraphernalia during the first search, it clearly cannot justify the second and third searches."); *DiCesare v. Stuart,* 12 F.3d 973, 978 (10th Cir.1993) ("The fact that the horses had been seen in plain view on the previous day did not insulate this second separate warrantless entry and seizure." (citing *Michigan v. Tyler* )).

The United States in its supplemental brief before this court and during reargument seeks to suggest, as does the majority opinion, that the question of whether a police officer was already present in the premises at the time the police made the third entry accompanied by the victim is somehow relevant to the lawfulness of the seizures during that entry. The appropriate answer to this contention is a straightforward one. The United States *conceded* below, at least three times, as its obligation for integrity in advocacy compelled it to do, see *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) (duty of United States Attorney in criminal prosecution), see also *Giglio v. United States,* 405 U.S. 150, 153–54, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (same), *Napue v. Illinois,* 360 U.S. 264, 269–70, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (same), that the third entry was constitutionally unlawful. Even if there was an officer still remaining within the premises when this entry was made, that officer's presence there was no longer constitutionally permissible, the consent for his/her presence having expired when *all* the persons in that premises had been removed therefrom for identification. As a result of that removal and identification process both Porter and Bruce had been arrested while the third person, Hunt, had been exculpated for the crime, but arrested on unrelated charges. Only two persons having been implicated by the victim as having been involved in the scheme to rob him at gun point and the police having verified that no other possible miscreant was on the premises, no constitutionally valid basis existed for an officer to remain within the premises.[7] As stated previously, the United

---

7. In its opinion, the majority references the written report of Officer Tighe referring to the

States candidly *concedes* this point as aforesaid citing *Florida v. Jimeno*, 500 U.S. 248, 252, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). That concession is constitutionally correct and required. In addition to *Florida v. Jimeno*, see *Thompson v. Louisiana*, 469 U.S. 17, 20–23, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984); *Mincey v. Arizona*, 437 U.S. 385, 391–95, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).[8]

The government's position was again plainly and clearly enunciated in its brief filed pursuant to our re-briefing order. There it stated:

> although the police re-entry with the victim into Bruce's home was not justified by the Fourth Amendment *given that she consented only to the police's initial entry,* suppression of the seized robbery proceeds would have been inappropriate because Mr. Walker's (the victim's) personal property was in "plain view" in the home when the police checked the home to see who was there, and the police could thus have seized those items during their initial sweep. (Emphasis added.)

The government urged that the illegality of the seizing entry did not render the seized items inadmissible in spite of the exclusionary rule announced in *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). For authority for this position the government cites to *Clark*

*v. United States*, 593 A.2d 186, 197–98 (D.C.1991), and *Settles v. United States*, 615 A.2d 1105, 1112 (D.C.1992). At reargument, in response to questions, the government made explicit its contention that the illegality of the seizing entry is constitutionally irrelevant and its contention that *Clark* is authority for this proposition.

The facts of *Clark* bear repeating. In response to a call of a shooting, Officer Cole arrived at Clark's apartment at 9:50 p.m. He went into the bedroom where the shooting had occurred and observed in plain view decedent's body, a pistol with which she had apparently been shot, and an ammunition clip containing unspent bullets. Cole remained on the premises to preserve the crime scene. At approximately 10:20 p.m., an evidence technician arrived, entered, photographed the body, and retrieved the pistol and ammunition clip, i.e., the "plain view" evidence. It is this entry by the evidence technician while Cole was still lawfully on the premises that the government reads our opinion in *Clark* to have held to be a constitutionally unlawful entry. Query? Would the coroner's office personnel entering to retrieve the dead body, while Cole remained on the premises, have been a constitutionally unlawful entry? Obviously not. Nor was the entry by the evidence technician. There was *no* additional intrusion on any privacy

---

officer who accompanied Hunt back inside. This was the second entry. In fact, it is not this "re-entry" that is at issue in this case, although why the police would take someone *back* into the premises, in which they suspected a sawed-off shotgun is secreted, to "ensuring against someone's 'jumping out with' the shotgun" defies logical explanation. This is particularly so since *everyone* had previously been removed therefrom. However, this is entirely besides the point. The re-entry at issue is the later one in which the victim was taken back into the premises to see if he could identify any of his property. In fact, the shot-

gun was recovered much later as a result of a constitutionally valid search pursuant to a search warrant.

**8.** Likewise, if the entry were sought to be justified under the "exigent circumstances" doctrine (armed robbery with suspects likely still present on premises), the "exigent circumstances" would have also expired. *See Maryland v. Buie*, 494 U.S. 325, 331–34, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990); *United States v. Harris*, 629 A.2d 481, 492 (D.C. 1993).

interest protected by the Fourth Amendment. Indeed, there is nothing in the opinion in *Clark* which speaks to how the evidence technician obtained entry, whether by consent, exigent circumstances (as seems clear from the stated facts), or otherwise. *Settles* is equally inapposite for the same reason and provides no support for the government's contention. It is important for all to remember what the Supreme Court said in *Armour & Co. v. Wantock*:

> It is timely again to remind counsel that words of our opinions are to be read in the light of the facts of the case under discussion. *To keep opinions within reasonable bounds precludes writing into them every limitation or variation which might be suggested by the circumstances of cases not before the Court. General expressions transposed to other facts are often misleading.*

323 U.S. 126, 132–33, 65 S.Ct. 165, 89 L.Ed. 118 (1944) (emphasis added); *accord, Kraft v. Kraft*, 155 A.2d 910, 913 (D.C.1959).

The majority ultimately eschews such a reading of *Clark* and *Settles*. This is not surprising given the teachings of *Coolidge, supra,* 403 U.S. at 470–71, 91 S.Ct. 2022 ("[W]here the police know in advance the location of the evidence and intend to seize it, the situation is altogether different[, and a warrant is required.]"); *Shamaeizadeh, supra,* 338 F.3d at 549 ("Although the plain view doctrine would likely have justified Wiles's seizure of immediately incriminating drug paraphernalia during the first search, it clearly cannot justify the second and third searches."); *DiCesare, supra,* 12 F.3d at 978 ("The fact that the horses had been seen in plain view on the previous day did not insulate this second separate warrantless entry and seizure." (citing *Michigan v. Tyler*)). In this regard, consider by way of contrast, the doctrine of inevitable discovery. *See McFerguson, supra,* 770 A.2d at 74–77 (holding that for inevitable discovery, "the lawful process which would have ended in the inevitable discovery [must] have ... commenced before the constitutionally invalid seizure." (alterations in original) (internal quotation marks omitted)).

Unable to justify a remand on the government's flawed reading of *Clark* and *Settles,* the majority resorts to what, in my view, is an impermissible re-writing of the government's repeatedly given concessions. The majority says:

> The government conceding as it did in the trial court that Officer Tighe's re-entry "with the victim" was not justified by the Fourth Amendment and acknowledging the illegality of any "search" that took place during the second entry as distinguished from Officer Tighe's seizure of items in plain view and recognized as incriminatory during the initial sweep agrees that any evidence that was the fruit of the Fourth Amendment violation was inadmissible.

Neither in the trial court, orally or in writing, nor in this court, orally or in writing, has the government ever parsed its concessions in such a fashion. Rather, as is shown by its opposition to Porter's motion to suppress in the trial court, and its brief and argument before us, the government's concessions relating to the police re-entry *with or without* the victim was based solely on the *expiration of consent,* citing as it did to *Florida v. Jimeno,* 500 U.S. at 252, 111 S.Ct. 1801. Likewise, in its brief filed prior to re-argument, the government stated "although the police re-entry with the victim into Bruce's house was not justified by the Fourth Amendment *given that she had consented only to the police initial entry.* ..." (emphasis added). I repeat, at no stage of these proceedings has the government suggested

the reading the majority now propounds. This is not surprising for I submit, if the government had done so, it would have been rightly subject to criticism for taking one position in the trial court and a contradictory position before us. *See, e.g., Duk Hea Oh v. National Capital Revitalization Corp.,* 7 A.3d 997, 1010 (D.C.2010) ("[A] defendant may not take one position at trial and a contradictory position on appeal."); *In re L.M.,* 5 A.3d 18, 19 (D.C. 2010) (same); *Cox v. United States,* 999 A.2d 63, 67 n. 5 (D.C.2010) (same). What the government does *not* seek to do, I suggest that the majority is seeking to do in its stead. And all without any party, or indeed the court, having an opportunity to ventilate and explore this construction during oral argument, since this construction first surfaced in the majority opinion. I find this inappropriate. *See Ford v. United States,* 533 A.2d 617, 624–25 (D.C.1987) (en banc) (" 'The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.' " (quoting *Carducci v. Regan,* 714 F.2d 171, 177 (D.C.Cir.1983) (citations omitted))); *see also Rose v. United States,* 629 A.2d 526, 536–37 (D.C.1993) (same).

In rejecting the majority's attempt to re-write the government's concessions, I am reminded of the quote from Senator Sam Erwin of North Carolina in retort to John Ehrlichman during the Senate Watergate Hearings: "Because I understand the English language. It is my mother tongue."

### Evidentiary Issues

The offense in this case occurred in 2003. The remand hearing in this case, which the majority authorizes, if held, will occur in 2012, approximately nine years after the offense and a number of years after the hearings before Judge Ross. If such a hearing is held, major evidentiary and proof problems will arise. Can the victim be located and produced to testify? Are the police officers still available? Given the passage of time, and its natural impact on human memory, what is the value of this testimony in 2012 about what they recollect about events occurring in 2003 pertaining to: (1) what was taken from the victim; (2) what the victim told the police was taken from him; (3) what did the police see during the first entry; (4) was this evidence in plain view during the first entry; (5) was such sighting during the constitutionally permissible period of the first entry; (6) was the incriminating nature of this evidence readily apparent; (7) did probable cause exist to seize this evidence at a constitutionally permissible period of first entry presence; (8) did they have to move items to see other items, see, for example, *Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987); and (9) which items are excludable, even under the majority opinion, given the participation of the victim. This difficulty is particularly acute given the apparent dearth of written documents that could be used to "refresh" the witnesses' recollection, even assuming such "refreshing" could, in fact, occur so belatedly.

The apparent answer of the majority to these evidentiary hurdles seems to be that they work to the detriment of Porter's burden. The majority does so by declaring that portion of *Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986), which speaks directly to the issue before us to be dictum. I disagree. While the Court, earlier in the *Kimmelman* opinion, discussed a defendant's burden to establish both prongs of a

*Strickland*[9] violation it is when the Court is discussing the burden of establishing the constitutional validity of a warrantless search that the Court speaks of the government's burden in language the majority dismisses as dictum. More importantly, however, there was *no* reason for Porter to proceed with an evidentiary hearing even if the majority is correct (which I dispute) that it was his burden to do so, given the United States' *repeated* and *correct* concessions that the third entry leading to the evidentiary seizures at issue here was constitutionally unlawful. Apparently, counsel for Porter, as do I, recognized that as long as these concessions were not repudiated, *Michigan v. Tyler, supra,* doomed any invocation of the plain view doctrine to failure. Whenever Porter thought the United States was retreating from its concessions, he demanded an evidentiary hearing to "confront the witnesses." The response of the United States was to reaffirm its adherence to the concessions. Indeed, even the majority seems to acknowledge that Judge Ross clearly recognized the legal effect of the concessions by the United States as dooming any relevance of plain view, because the majority quotes from Judge Ross's ruling that he was prepared to entertain argument with respect to the first and third entries but not the second. Judge Ross said:

> "And there were a few other details I recounted last time. . . . I wanted to give [both sides] a chance to argue, but I essentially think that . . . I didn't know if you wanted an evidentiary hearing or what, but I still think that you're right. It has to be based on something in regards to the first [search] and the third [search], but not the second [search]."

In light of all this, I will not dwell further in a rebuttal of the majority's analysis of who had the burden of proof, etc. on the suppression portion of this post-trial motion.

## Conclusion

My principal concern leading me to emphatically dissent in this case is not with the individual litigant, Porter. I am satisfied that a proper application of the plain view doctrine and the constitutional hurdles existing in establishing the admissibility of the challenged evidence, as well as the evidentiary problems I have noted, will likely cause the government not to seek a further hearing and to concede the result compelled by *Michigan v. Tyler* and their concessions pertinent thereto. Further, if such a hearing were held, I am sanguine that the constitutional issues which I have discussed will lead the trial court to reject the plain view doctrine as inapposite in this case as did Judge Ross previously. If I am wrong on both these points, I am confident that future appellate review by another division of this court will vindicate Porter's constitutional rights.

Rather, the concerns which prompt me to so strongly dissent are jurisprudential, relating to the integrity, propriety, and efficiency of our judicial process. These concerns have been central to me and have motivated my service on this court since I joined it on October 14, 1976, over thirty-five years ago. *See, e.g., Davis v. United States,* 564 A.2d 31 (D.C.1989) (en banc) (standards of appellate review); *United States v. Felder,* 548 A.2d 57 (D.C.1988) (holding that review is *de novo* in questions of collateral estoppel); *Johnson v. United States,* 398 A.2d 354 (D.C.1979) (exercise of discretion and appellate review thereof). It is these concerns that caused me to request the court pose to the parties the questions we did for supplemental briefing and argument. It is to these con-

---

9. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

cerns I speak in conclusion. This court should explicitly adopt the holding of the Supreme Court in *Giordenello* and its progeny.[10] A faithful application of that standard: "special circumstances suggesting such an exceptional course," mandates that we not remand this case for further proceedings. Any holding such as that in the majority opinion suggesting that the facts of this case meet that rigorous standard, in my view, makes a mockery of that standard. If this case does, I submit it is impossible to postulate a case which would not. It is because of these jurisprudential concerns about the judicial process that I "emphatically dissent."

*Appendix*

1. Statutes

 a. District of Columbia Human Rights Act ("DCHRA") & Title VII of Civil Rights Act of 1964

 i. *Kumar v. District of Columbia Water & Sewer Auth.,* 25 A.3d 9, 16 (D.C.2011)

 ii. *Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 361 n. 17 (D.C. 1993)

 b. DCHRA (D.C.Code § 2–1402.11(a) (2001)) & Americans with Disabilities' Act

 i. *Teru Chang v. Inst. for Public–Private P'ships, Inc.,* 846 A.2d 318, 324 (D.C.2004)

 c. District of Columbia Arbitration Act and Federal Arbitration Act

 i. *Bolton v. Bernabei & Katz, PLLC,* 954 A.2d 953, 960 n. 5 (D.C.2008)

 ii. *Hercules & Co. v. Beltway Carpet Service, Inc.,* 592 A.2d 1069, 1072–73 (D.C.1991)

 d. Federal embezzlement statute & D.C.Code embezzlement

 i. *Wittenberg v. United States,* 366 A.2d 128, 132 & n. 5 (D.C.1976)

 e. Federal Habeas Corpus Statute

 i. U.S. Supreme Court

 (1) *Swain v. Pressley,* 430 U.S. 372, 377, 97 S.Ct. 1224, 1228, 51 L.Ed.2d 411 (1977)

 ii. D.C. Court of Appeals

 (1) *United States v. Little,* 851 A.2d 1280, 1282 n. 1 (D.C.2004)

 (2) *Peoples v. Roach,* 669 A.2d 700, 702 (D.C.1995)

 (3) *Butler v. United States,* 388 A.2d 883, 886 n. 5 (D.C.1978)

 f. Federal wiretap statute D.C. wiretap statute

 i. *United States v. Sell,* 487 A.2d 225, 228–29 (D.C.1985)

 g. Statutory waiver of sovereign immunity

 i. *Kelton v. District of Columbia,* 413 A.2d 919, 921 & n. 4 (D.C.1980)

 h. D.C. Workers Compensation Act

 i. *Dillon v. District of Columbia Dep't of Empl. Servs.,* 912 A.2d 556, 559 n. 5 (D.C.2006)

 ii. *Porter v. District of Columbia Dep't of Empl. Servs.,* 518 A.2d 1020, 1024 (D.C.1986) (Rogers, J., dissenting)

 i. Federal Anti–Injunction Act and the D.C. Anti–Injunction Act

 i. *District of Columbia v. Craig,* 930 A.2d 946, 953 n. 7 (D.C.2007)

 ii. *District of Columbia v. United Jewish Appeal Fed'n,* 672 A.2d 1075, 1079 n. 3 (D.C.1996)

 j. Federal APA and DCAPA

---

**10.** I am satisfied that the majority's failure to explicitly adopt the *Giordenello* standard does not interfere with a subsequent division of this court doing so.

i. *Lee v. District of Columbia Bd. of Appeals & Review,* 423 A.2d 210, 216 (D.C.1980)

ii. *Basiliko v. District of Columbia,* 283 A.2d 816, 818 (D.C.1971)

k. Probation Act

i. *Willis v. United States,* 250 A.2d 569, 570 (D.C.1969)

l. Federal bail statute

i. *Scott v. United States,* 633 A.2d 72, 73 & n. 1 (D.C.1993)

m. Drug Free Zones law, federal and D.C.

i. *Goodson v. United States,* 760 A.2d 551, 553–54 (D.C.2000)

n. Breaking and Entering, federal and D.C.

i. *Jones v. United States,* 336 A.2d 535, 538 n. 4 (D.C.1975)

o. Contempt, federal and D.C.

i. *United States v. Maye,* 675 A.2d 57, 59 (D.C.1996)

2. Rules

a. See generally

i. D.C.Code § 11–743 (2001)

ii. D.C.Code § 11–946 (2001)

b. Federal Rules of Criminal Procedure & Superior Court Rules of Criminal Procedure

i. Rule 6

(1) *Law v. United States,* 488 A.2d 914, 915 (D.C.1985)

ii. Rule 8

(1) *Goldkind v. Snider Bros., Inc.,* 467 A.2d 468, 472 (D.C.1983)

(2) *Joyner v. United States,* 540 A.2d 457, 459 n. 1 (D.C.1988)

iii. Rule 16

(1) *Rowland v. United States,* 840 A.2d 664, 678 n. 16 (D.C.2004)

(2) *Davis v. United States,* 623 A.2d 601, 605 n. 12 (D.C.1993)

(3) *Waldron v. United States,* 370 A.2d 1372, 1373 (D.C.1977)

iv. Rule 17

(1) *Brown v. United States,* 567 A.2d 426, 428 n. 6 (D.C.1989)

v. Rule 25

(1) *In re D.M.R.,* 373 A.2d 235, 237 (D.C.1977)

vi. Rule 32

(1) *Warren v. United States,* 436 A.2d 821, 841 n. 45 (D.C.1981)

vii. Rule 33

(1) *Sellars v. United States,* 401 A.2d 974, 978 (D.C.1979)

(2) *Diamen v. United States,* 725 A.2d 501, 506 (D.C.1999)

viii. Rule 35

(1) *Brown v. United States,* 795 A.2d 56, 61 (D.C.2002)

(2) *United States v. Nunzio,* 430 A.2d 1372, 1374 n. 6 (D.C.1981)

(3) *McDaniels v. United States,* 385 A.2d 180, 181 n. 2 (D.C.1978) (per curiam)

ix. Rule 43

(1) *Campbell v. United States,* 295 A.2d 498, 501 (D.C.1972)

(2) *Arnold v. United States,* 443 A.2d 1318, 1327 n. 10 (D.C.1982)

c. Federal Rules of Civil Procedure & Superior Court Rules of Civil Procedure

i. Rule 3

(1) *Varela v. Hi–Lo Powered Stirrups,* 424 A.2d 61, 65 (D.C.1980)

ii. Rule 6

(1) *Wallace v. Warehouse Employees Union # 730,* 482 A.2d 801, 807 (D.C.1984)

iii. Rule 8

(1) *Feldman v. Gogos,* 628 A.2d 103, 104 n. 1 (D.C.1993)

(2) *Whitener v. Washington Metropolitan Area Transit Authority,* 505 A.2d 457, 458 (D.C.1986)

iv. Rule 11

(1) *Park v. Sandwich Chef,* 651 A.2d 798, 802 n. 4 (D.C.1994)

(2) *Montgomery v. Jimmy's Tire & Auto Center, Inc.,* 566 A.2d 1025, 1027 (D.C.1989)

v. Rule 15

(1) *Arrington v. District of Columbia,* 673 A.2d 674, 680 n. 6 (D.C. 1996)

(2) *Strother v. District of Columbia,* 372 A.2d 1291, 1297 n. 15 (D.C.1977)

(3) *Pritchett v. Stillwell,* 604 A.2d 886, 888 n. 2 (D.C.1992)

(4) *International Tours & Travel, Inc. v. Khalil,* 491 A.2d 1149, 1153 n. 7 (D.C.1985)

vi. Rule 19

(1) *Kelley v. Cox,* 105 A.2d 255, 256 n. 3 (D.C.1954)

vii. Rule 24

(1) *Vale Properties, Ltd. v. Canterbury Tales, Inc.,* 431 A.2d 11, 13 n. 3 (D.C.1981)

viii. Discovery Rules Generally

(1) *Snyder v. Maryland Casualty Co.,* 187 A.2d 894, 895 (D.C.1963)

(2) *Doherty v. Shamley,* 132 A.2d 862, 863–64 (D.C.1957)

ix. Rule 26

(1) *Gubbins v. Hurson,* 885 A.2d 269, 277 n. 3 (D.C.2005)

(2) *Adkins v. Morton,* 494 A.2d 652, 656 & n. 5 (D.C.1985)

(3) *Abbey v. Jackson,* 483 A.2d 330, 334–35 & n. 5 (D.C.1984)

(4) *Floyd v. Leftwich,* 456 A.2d 1241, 1245 n. 4 (D.C.1983)

x. Rule 41

(1) *Waters v. Castillo,* 755 A.2d 478, 481 (D.C.2000)

(2) *Taylor v. Washington Hospital Center,* 407 A.2d 585, 590 n. 4 (D.C. 1979)

(3) *Bazata v. National Ins. Co.,* 400 A.2d 313, 314 n. 1 (D.C.1979)

(4) *Boks v. Charles E. Smith Management, Inc.,* 453 A.2d 113, 114 n. 1 (D.C.1982)

(5) *Beckwith v. Beckwith,* 379 A.2d 955, 959 n. 5 (D.C.1977)

xi. Rule 43–I

(1) *Durant v. United States,* 551 A.2d 1318, 1331 (D.C.1988) (Newman, J., concurring)

xii. Rule 54

(1) *Dyhouse v. Baylor,* 455 A.2d 900, 901 n. 3 (D.C.1983) (per curiam)

xiii. Rule 54–II

(1) *Herbin v. Hoeffel,* 727 A.2d 883, 888 n. 10 (D.C.1999)

xiv. Rule 60

(1) *Lynch v. Meridian Hill Studio Apts., Inc.,* 491 A.2d 515, 518 n. 4 (D.C.1985)

d. Other Rules

i. Super. Ct. Neg. R. 1(a)

(1) *In re C.A.P.,* 356 A.2d 335, 343 (D.C.1976) ("While there are no corresponding federal neglect rules, we nonetheless look to the scope and effect of the federal rules for guidance in determining the scope and effect of the Superior Court rules.")

ii. Federal Rule of Appellate Procedure & D.C. Court of Appeals Rule 4

(1) *In re AK. V.,* 747 A.2d 570, 574 n. 10 (D.C.2000)

(2) *Thomas v. United States,* 586 A.2d 1228, 1230 n. 3 (D.C.1991) (per curiam)